# PAUL D. DUNLAP AND SHIRLEY A. DUNLAP, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6726–76, 7858–76, 2414–77, 2779–77, 5351–77, 9438–77.     Filed September 24, 1980.

---

[1]Cases of the following petitioners are consolidated herewith for purposes of trial, briefing, and opinion: Hawkeye Bancorporation, docket No. 7858–76; Hawkeye Bancorporation, docket No. 2414–77; Paul D. Dunlap and Shirley A. Dunlap, docket No. 2779–77; Paul D. Dunlap and Shirley A. Dunlap, docket No. 5351–77; and Hawkeye Bancorporation, docket No. 9438–77.

*Kent O. Littlejohn* and *Michael L. Sullivan,* for the petitioners.

*Robert L. Archambault,* for the respondent.

HALL, *Judge:* Respondent determined the following income tax deficiencies and additions to tax:

| Petitioners | Docket No. | Year | Deficiency | Sec. 6653(b)[2] addition to tax |
|---|---|---|---|---|
| Paul D. Dunlap and | | | | |
| Shirley A. Dunlap | 2779–77 | 1971 | $125,780 | $62,890 |
| | 6726–76 | 1972 | 289,709 | 144,855 |
| | 5351–77 | 1973 | 40,914 | 20,457 |
| Hawkeye Bancorporation | 2414–77 | 1971 | 16,513 | --- |
| | 7858–76 | 1972 | 523,915 | --- |
| | 9438–77 | 1973 | 340,775 | --- |

In his amended answer in docket No. 5351–77 (Paul D. Dunlap and Shirley A. Dunlap), respondent asserts that the deficiency should be increased by $49,313 for a total deficiency of $90,227. In his amended answer in docket No. 2414–77 (Hawkeye Bancorporation), respondent asserts that the deficiency should be increased by $327,123 for a total deficiency of $343,636.

Due to concessions by the parties,[3] the issues remaining are:

(1) Whether Hawkeye Bancorporation realized $681,507 in unreported taxable interest income in 1971 or 1972; if so, then whether Paul D. and Shirley A. Dunlap are entitled to a $568,904 interest expense deduction for 1972.

(2) Whether payments of $148,199 and $125,286 received by Paul D. and Shirley A. Dunlap from Hawkeye Bancorporation in 1972 in connection with the sale of Jasper County Savings Bank stock constitute ordinary or capital gain income. If we determine that these payments constitute ordinary income to Paul D. and Shirley A. Dunlap, then we must determine whether Hawkeye Bancorporation is entitled to expense deductions of $177,271 and $149,864 in 1972 relative to payments made in connection with the Jasper County Savings Bank stock acquisition.

(3) Whether $29,671, $348,622, and $131,114 paid by Hawkeye Bancorporation in 1971, 1972, and 1973, respectively, represent currently deductible business expenses or capital expenditures made to acquire the controlling interests of other corporations.

(4) Whether Hawkeye Bancorporation's option to purchase the Stephens Building expired or lapsed during 1973 thereby entitling Hawkeye Bancorporation to a $35,000 loss deduction.

---

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[3] The parties settled a number of issues including the sec. 6653(b) additions to tax with respect to petitioners Paul D. Dunlap and Shirley A. Dunlap, docket Nos. 2779–77, 6726–76, and 5351–77.

(5) Whether petitioner Paul D. Dunlap had sufficient investment interest in the buildings, site improvements, and equipment comprising a Safeway Stores, Inc., facility in El Paso, Tex., to entitle him to deduct depreciation expense. If so, then we must determine the useful life of the buildings.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

At the time of filing their petitions, petitioners Paul D. and Shirley A. Dunlap were residents of Des Moines, Iowa. When we hereafter refer to Dunlap, we will be referring to Paul.

Hawkeye Bancorporation (Hawkeye), a corporation organized under the laws of Iowa, had its principal place of business in Des Moines, Iowa, at the time it filed its petitions. Hawkeye is a bank holding company registered under the Bank Holding Company Act of 1956. As of December 31, 1973, Hawkeye owned a controlling shareholder interest in 13 commercial banks located in Iowa. For Federal tax purposes, Hawkeye employs the accrual method of accounting on a calendar year basis. During the years in issue, Hawkeye filed consolidated returns with its subsidiary constituent banks.

Dunlap is the founder and president of Hawkeye. During the years in issue, Dunlap was also a shareholder and a director of Hawkeye. Hawkeye is owned by approximately 4,500 shareholders.

### Purchase of Jasper County Savings Bank

Prior to July 1, 1969, Dunlap, as president of Hawkeye, was approached by a representative of a group of controlling shareholders of Jasper County Savings Bank (Jasper) who inquired whether Hawkeye was interested in purchasing the Jasper stock. During this time, however, the Bank Holding Company Act of 1956 prohibited a bank holding company such as Hawkeye from acquiring a bank without prior approval from the Board of Governors of the Federal Reserve System (F.R.B.).[4]

---

[4]Federal Reserve Board approval involves the following procedure. First, a written application for approval to acquire a bank is submitted to the Federal Reserve District in which the acquiring bank is located. The Federal Reserve District then has 12 business days to reply as to the sufficiency of the application. Upon formal acceptance by the Federal Reserve

The Jasper shareholders were not willing to enter into an agreement to sell the bank to Hawkeye subject to F.R.B. approval or to wait for Hawkeye to obtain approval before entering into a purchase agreement.

On July 1, 1969, Dunlap and Myron Weil, another officer and shareholder of Hawkeye, entered into an agreement with the holders of 4,683.75 of the 5,000 shares of Jasper to purchase their shares at $830 per share. Dunlap and Weil wanted to acquire at least 80 percent of the Jasper stock so that Hawkeye could acquire Jasper as a subsidiary constituent bank when, and if, it received approval from the F.R.B.

Dunlap and Weil agreed to pay the selling Jasper shareholders 20 percent of the $830 per share purchase price ($166 per share) at the time of closing, with the balance to be paid in five equal installments of $132.80 per share on July 1 in each of the years 1970 through 1974, together with 4½-percent interest on each installment compounded annually from July 1, 1969, to the due date of the installment. Dunlap and Weil executed promissory notes for the installment portion of the purchase price. The Jasper shareholders had the option to elect to receive shares of Dunlap's and Weil's Hawkeye class A stock, valued at $11 per share, in lieu of payment of the installment notes.

On August 5, 1969, Dunlap and Weil contracted to sell the stock they acquired from the Jasper shareholders to Hawkeye at $830 per share. In anticipation that Dunlap and Weil would eventually be able to obtain all 5,000 shares of the Jasper stock outstanding, Hawkeye agreed to, and did, pay Dunlap and Weil immediately $4,150,000 ($830 per share for 5,000 shares). The actual transfer of stock to Hawkeye would occur following F.R.B. approval of Hawkeye's acquisition. Paragraph 4 of this agreement (1969 purchase agreement) provided as follows:

District, the application is forwarded to the Board of Governors of the Federal Reserve System which has 90 days to supply a response to the applicant. If the staff of the Board of Governors seeks additional information from the applicant, an additional 90-day period is initiated. After approval of the Board of Governors is obtained, the U.S. Department of Justice has 30 days to object to the approval. There is no certainty that the Federal Reserve Board will approve an application for acquisition. In those cases in which Hawkeye's request to acquire another bank has been approved, the time required to obtain approval has ranged from an average of 9 months to over 2 years. During the period in issue, an individual could acquire a bank, either outright or by contract, without being subjected to any of the requirements of prior approval by the Federal Reserve Board.

In consideration of payment in full for the Bank Shares on the date of execution hereof, and for the right to use said funds, Sellers [Dunlap and Weil] agree to pay to Buyer [Hawkeye] as interest therefor, the greater of (1) 5% per annum payable annually on the anniversary of the date hereof or (2) an amount equal to the net earnings of the Bank attributable to the Bank Shares to be sold hereunder from and after July 1, 1969. The net earnings shall be those shown on the books of the Bank in accordance with its usual method of accounting which would have been reflected in Buyer's earnings under generally accepted accounting principles as a parent corporation of the Bank had said Bank Shares been transferred to Buyer on July 1, 1969. Payment of such amounts shall be made as follows:

(a) An amount equal to any dividends paid by the Bank to Sellers on account of such Bank Shares shall be paid to Buyer forthwith upon receipt of said dividends by Sellers.

(b) In the event the Federal Reserve Board approves the acquisition of said Bank Shares and such Bank Shares are acquired by Buyer hereunder, the Sellers, by transferring such Bank Shares, shall be deemed to have discharged their obligation to pay an amount equal to the undistributed earnings of the Bank attributable to said Bank Shares, if the warranties at Section 8 hereof are met, but if the aforesaid 5% exceeds said net earnings, the remainder due shall be paid at the time of such transfer.

(c) In the event the Federal Reserve Board denies Buyer's application to acquire said Bank Shares, or has not granted approval of Buyer's acquisition of the Bank Shares prior to July 1, 1974, on the date such denial becomes finally effective or on July 1, 1974, whichever is earlier, Sellers shall pay to Buyer an amount equal to the greater of 5% per annum or such Bank earnings, less amounts previously paid hereunder.

If the F.R.B. denied Hawkeye's application to acquire Jasper or did not grant approval by July 1, 1974, then Dunlap and Weil were also to repay the $4,150,000. Hawkeye was not to have the power to vote the Jasper stock until actual acquisition.

After Dunlap and Weil executed the agreement with the Jasper shareholders and the 1969 purchase agreement with Hawkeye, they executed a coownership agreement with their spouses. Pursuant to this coownership agreement, the parties agreed to share all rights, interests, obligations, and liabilities with respect to the agreement with Jasper shareholders and the 1969 purchase agreement with Hawkeye in the following percentages:

| Co-owner | Percentage |
|---|---|
| Paul D. Dunlap | 41.8 |
| Shirley A. Dunlap | 41.8 |
| Myron Weil | 8.2 |
| Pauline Weil | 8.2 |

When we hereinafter refer to Dunlap and Weil, we will be referring to the rights of the parties under this coownership agreement.

On or about August 15, 1969, Dunlap and Weil purchased 4,683.75 shares of Jasper stock pursuant to the agreement with the Jasper shareholders. In July 1970, Dunlap and Weil purchased the remaining 316.25 shares from other Jasper shareholders for $184,855.65. Dunlap and Weil did not purchase the Jasper stock as agents for Hawkeye. If the F.R.B. had disapproved of Jasper's acquisition, Jasper would have continued to be owned by Dunlap and Weil until such time as they could dispose of it.

By August 15, 1969, Hawkeye had paid Dunlap and Weil $4,150,000 pursuant to the 1969 purchase agreement. With this money, Dunlap and Weil purchased from Hawkeye its 5¾-percent convertible notes due in 1974. These notes were secured by shares of common stock of constituent banks owned by Hawkeye. The principal amount of each note was convertible into shares of Hawkeye class A stock with an exchange rate which mirrored the exchange formula in the tender offer that Dunlap and Weil made to the Jasper shareholders. The notes were used by Dunlap and Weil as collateral to acquire bank loans, the proceeds of which were used to satisfy payment obligations to the Jasper shareholders and to service debts incurred to finance the acquisition of the Jasper stock.

Under an escrow agreement dated August 15, 1969, the Jasper shareholders deposited their shares of Jasper stock with the Iowa-Des Moines National Bank (escrow agent). In return, Dunlap and Weil deposited the consideration for the Jasper stock purchase (cash and installment notes) with the escrow agent who in turn delivered this consideration to the Jasper shareholders. Before each date that the notes held by the Jasper shareholders became due, Dunlap and Weil deposited the appropriate amount of cash and Hawkeye class A stock with the escrow agent for distribution to the Jasper shareholders. New Jasper stock certificates were then issued to Dunlap and Weil. Initially, however, the escrow agent held all these shares as security for payment of principal and interest on the notes owed to the Jasper shareholders by Dunlap and Weil. The escrow agent periodically released the Jasper stock to Dunlap and Weil as they fulfilled their installment obligations to the original Jasper shareholders. At the request of Dunlap and Weil, the

escrow agent would transfer the Jasper stock certificates into Hawkeye's name.

After entering into the 1969 purchase agreement, Hawkeye filed an application with the F.R.B. requesting approval to acquire the common stock of Jasper. In March 1971, the staff under the Federal Reserve Board sent Hawkeye a letter stating that, by the terms of the 1969 purchase agreement, Hawkeye had violated section 3(a)(3) of the Bank Holding Act of 1956. This provision relates to the direct or *indirect* acquisition of ownership or control of voting shares of a bank without prior approval of the Federal Reserve Board. The staff determined that:

In effect Hawkeye has paid for all the shares of Jasper; has incurred debt in the amount of $4,150,000 for the purpose of acquiring such shares; has in effect pledged its assets as collateral for the bank loans for the purchase of the stock. These circumstances plus the fact that Hawkeye is now receiving the earnings of Jasper indicate that Hawkeye in fact has acquired the indirect ownership of Jasper.

In order to comply with the directives of the F.R.B., Hawkeye and Dunlap and Weil, on July 1, 1971, entered into a rescission agreement (rescission agreement), which provided in pertinent part:

WHEREAS, in connection with pending acquisitions, approval of which is required by the Board of Governors of the Federal Reserve System, the parties hereto desire to rescind the 1969 Agreement, subject to the terms and conditions herein,

Now, THEREFORE, in consideration of the premises and the agreements made herein, it is hereby agreed:

1. The 1969 Agreement is hereby rescinded effective as of July 1, 1971.

2. Dunlap and Weil hereby and herewith repay to Hawkeye the purchase price of the Bank Shares conditionally sold under the 1969 Agreement, said purchase price being $4,150,000, receipt of which is hereby acknowledged by Hawkeye by set-off against a like amount due Dunlap and Weil from Hawkeye.

3. In addition, Dunlap and Weil agree to pay to Hawkeye in complete settlement of the 1969 Agreement the amount of $504,439,[5] plus an amount equal to the net earnings of the Bank from January 1, 1971, through June 30, 1971, said amount payable on July 1, 1974, with interest at 5¾% per annum from July 1, 1971. In the event that Hawkeye shall hereafter acquire said Bank Shares on or before July 1, 1974, with prior approval of the Board of Governors of the Federal Reserve System, and if the Bank shall have paid no dividends in

---

[5]Jasper's net income from July 1, 1969, to Dec. 31, 1970, was $504,439.

the interim, the obligation of Dunlap and Weil under this Paragraph 3 shall be void and of no effect.

In order to secure their personal obligation to Hawkeye under paragraph 3 of the rescission agreement, Dunlap and Weil pledged, and granted a subordinated security agreement in, various collateral to Hawkeye.

On July 1, 1971, Hawkeye and Dunlap and Weil also entered into a redemption agreement which formalized the setoff referred to in the rescission agreement. Pursuant to this agreement, on or about July 1, 1971, Dunlap and Weil repaid Hawkeye the $4,150,000 previously advanced to them by a setoff against Hawkeye's 5¾-percent convertible secured notes.

On this same date, Hawkeye and Dunlap and Weil entered into a new purchase agreement (1971 purchase agreement) which provided for a basic purchase price of $4,150,000 plus interest and carrying charges as follows:

THIS AGREEMENT, entered into as of July 1, 1971, by and between Paul D. Dunlap and Myron Weil (the "Sellers") and Hawkeye Bancorporation, an Iowa corporation (the "Buyer"),

### WITNESSETH

WHEREAS, the Sellers are the purchasers under that certain Agreement for the Purchase and Sale of More Than 80% of the Outstanding Capital Stock of Jasper County Savings Bank of Newton, Iowa, entered into as of July 1, 1969, (which Agreement, together with all Exhibits attached thereto, including without limitation the Escrow Agreement designated Exhibit B, are hereinafter collectively referred to as the "Jasper Purchase Contract"); and,

WHEREAS, Hawkeye desires to acquire all of the Sellers' interest in and under the Jasper Purchase Contract, and all the shares of Jasper County Savings Bank, Newton, Iowa (the "Bank"), owned by Sellers, subject to the prior approval of the Board of Governors of the Federal Reserve System,

Now, THEREFORE, in consideration of the premises and the following agreements, it is hereby agreed:

1. The Sellers hereby agree to transfer to Hawkeye the following:

a. The 2,002¼ shares of stock of the Bank owned by them;

b. The 2,997¾ shares of stock of the Bank held in Escrow under the Jasper Purchase Contract; and,

c. The Sellers' options from the directors of the Bank to purchase bank shares when a director ceases to be a director;

for a total price determined pursuant to Paragraph 2 of this Agreement.

2. Payment shall be made by Hawkeye to Sellers as follows:

a. Hawkeye, subject to prior approval of the Board of Governors of the Federal Reserve System, agrees to deliver to Sellers at the closing promissory notes in the principal amount of $1,866,006, payable in three installments of

$622,002 each on July 1 of each of the years 1972 through 1974, together with interest on the outstanding principal balance at 9½% per annum from and after July 1, 1971, payable on the date of each installment, and

b. Hawkeye shall make payment in cash of $2,283,994 [the remainder of the $4,150,000] at the time of closing, which shall occur within the time limitations established by the Board of Governors of the Federal Reserve System, and

c. Hawkeye shall reimburse Sellers for their interest, expense and costs incurred in connection with carrying their interest in the Bank Shares purchased under the Jasper Purchase Contract from July 1, 1971, to the time of closing. It is the intention of the parties that this sub-paragraph c be construed so that Sellers neither incur a loss nor receive a profit from July 1, 1971, to the time of closing.

3. Sellers agree to apply the proceeds of the promissory notes referenced at paragraph 2a hereof solely to the performance of their obligation under the Jasper Purchase Contract and to deliver to Hawkeye all shares of stock of the Bank presently held in Escrow under the Jasper Purchase Contract as the same become deliverable to them. As security therefor, Sellers agree to pledge to Hawkeye at the closing the promissory notes referenced in paragraph 2a hereof.

4. Sellers agree to cause the Bank to pay no dividends prior to the closing of this Agreement.

5. This Agreement is conditioned upon Hawkeye receiving prior approval of the Board of Governors of the Federal Reserve System to acquire the Bank Shares, subject to the liabilities of the Sellers under the Jasper Purchase Contract. Should approval not be received prior to July 1, 1974, this Agreement shall be void and of no effect.

For Hawkeye to obtain F.R.B. approval of the Jasper acquisition, Dunlap and Weil could not receive more money than their cost of the Jasper stock plus any carrying charges. Thus, the total consideration specified in paragraph 2 of this agreement was designed to put Dunlap and Weil in the same financial position in which they would have been had Hawkeye purchased the Jasper stock for $4,150,000 on July 1, 1971, and charged Dunlap and Weil nothing for their use of $4,150,000 from July 1, 1969, through June 30, 1971. The $1,866,006 promissory note described in paragraph 2(a) paralleled the remaining installment payments owed by Dunlap and Weil to the Jasper shareholders. The 9½-percent "interest" to be paid on the outstanding balance of the $1,866,006 note was designed to cover the interest owed by Dunlap and Weil to the original Jasper shareholders.

However, the record does not disclose why the 9½-percent note differed from the 4½-percent note which Dunlap and Weil had agreed to pay to the original Jasper shareholders. The $2,283,994 cash payment specified in paragraph 2(b) was intended to correspond to the payments Dunlap and Weil had made to

the original Jasper shareholders. Subparagraph 2(c) was intended to compensate Dunlap and Weil for interest paid after June 30, 1971, on approximately $2,283,994 in funds borrowed from the outside sources and paid to the original Jasper shareholders for their stock, plus any out-of-pocket expenses. The $149,864 paid to Dunlap and Weil pursuant to this provision at the time of closing equaled 7 percent (1 year and 2 months at 6 percent per annum) of the approximately $2,283,994 borrowed by Dunlap and Weil to finance their purchase of the Jasper stock.

From July 1, 1969, to June 30, 1971, Jasper's net income was as follows:

| Period | Income |
|---|---|
| July 1, 1969, to Dec. 31, 1969 .............. | $149,810 |
| Jan. 1, 1970, to June 30, 1970 ............ | 162,025 |
| July 1, 1970, to Dec. 31, 1970 .............. | 192,604 |
| Jan. 1, 1971, to June 30, 1971 ............ | 177,068 |
| | 681,507 |

The undistributed net income of Jasper from July 1, 1971; to June 30, 1972, was $321,147.

On its books for the years 1969, 1970, and 1971, Hawkeye debited "Accounts Receivable Under Jasper Contract" and credited "Income Earned Under Jasper Contract" in the following amounts on the dates indicated:

| Date of journal entry | Amount |
|---|---|
| 8/31/69 | $32,355.23 |
| 9/30/69 | 27,732.54 |
| 10/31/69 | 57,288.00 |
| 11/30/69 | 11,644.00 |
| 12/31/69 | 13,243.33 |
| 1/31/70 | 31,765.00 |
| 2/28/70 | 25,585.00 |
| 3/31/70 | 53,394.00 |
| 4/30/70 | 33,747.00 |
| 5/31/70 | (5,793.00) |
| 6/30/70 | 23,327.00 |
| 7/31/70 | 36,200.00 |
| 8/31/70 | 27,008.00 |

| | |
|---|---:|
| 9/30/70 | $22,883.00 |
| Correcting entry | 9,537.00 |
| 10/31/70 | 18,164.00 |
| 11/30/70 | 21,489.00 |
| 12/31/70 | 64,870.00 |
| 1/31/71 | 22,480.00 |
| 2/28/71 | 18,961.00 |
| 3/31/71 | 32,096.00 |
| 4/30/71 | 22,861.00 |
| 5/31/71 | 32,232.00 |
| 6/30/71 | 48,438.00 |
| | 681,507.10 |

Hawkeye did not credit the "Income Earned Under Jasper Contract" book account by the amount of Jasper's earnings during the period July 1, 1971, through July 12, 1972. After June 30, 1971, the balance in this account ($681,507) was transferred to an account receivable due from Dunlap and Weil. The account receivable was subsequently closed when Hawkeye received the Jasper stock at which time Jasper's earnings were still undistributed.

For Federal income tax purposes, Hawkeye considered the amounts credited to its "Income Earned Under Jasper Contract" account as undistributed income of a subsidiary bank. Specifically, the amounts credited were shown as an adjustment on Schedule M–1 of Hawkeye's income tax returns, Form 1120, for the years in which "earned" under the Jasper contract. The amounts were not included in Hawkeye's taxable income.

On June 12, 1972, the F.R.B. approved the acquisition of 100 percent of Jasper stock by Hawkeye. On July 12, 1972, Hawkeye acquired the 5,000 shares of Jasper common stock from Dunlap and Weil for which Dunlap and Weil received $4,399,325. This amount was computed in accordance with the following provisions of the 1971 purchase agreement:

| *Subparagraph* | *Amount* |
|---|---:|
| 2(a) (promissory notes) | $1,866,006 |
| 2(a) (9½% interest on promissory notes from July 1, 1971, to June 30, 1972) | 177,271 |

2(b) (cash at closing) ....................................... [6] $2,206,184
2(c) (sellers' expenses in carrying the Jasper
    stock from July 1, 1971, to July 12, 1972) .....   149,864
                                      4,399,325

The promissory note for $1,866,006 was executed by Hawkeye on the date of closing, July 12, 1972, effective as of July 1, 1971.

The Jasper stock was transferred to Hawkeye without any dividends being distributed by Jasper prior to closing. Hawkeye treated the $681,507 undistributed interest earnings of Jasper as a contribution to capital, adding this amount to its $4,399,325 cost basis in the Jasper stock. Hawkeye did not report the $681,507 as taxable income. Although respondent did not disturb Hawkeye's capitalization of the $681,507, he did determine, in his statutory notice for 1972, that Hawkeye should have first reported the $681,507 as interest income.

From 1970 to 1974, Dunlap and Weil paid the following amounts of interest on the installment notes issued to the Jasper shareholders:

| Year | Amount |
|---|---|
| 1970 | $55,777.16 |
| 1971 | 117,052.73 |
| 1972 | 113,970.00 |
| 1973 | 6,737.00 |
| 1974 | 153,525.60 |
| | 447,062.49 |

Paul D. Dunlap and Shirley A. Dunlap (the Dunlaps) claimed 83.6 percent of the above amounts as interest expense deductions for the taxable years 1970 through 1974, inclusive. The amounts claimed for the years in issue are not in dispute.

From August 1969 to the time of sale of the Jasper stock to Hawkeye on July 12, 1972, Dunlap and Weil paid the following amounts of interest in the year indicated to various non-Hawkeye related banks to finance their purchase of the Jasper stock from the Jasper stockholders:

---

[6]Subpar. 2b of the 1971 purchase agreement provided for $2,283,994 to be received by Dunlap and Weil at closing. However, the F.R.B. would not permit Dunlap and Weil to receive the full $2,283,994 because they acquired some of the Jasper stock for less than $830 per share which reduced their total acquisition costs by $77,810. The F.R.B. required this adjustment to be passed through to Hawkeye by reducing the $2,283,994 to the $2,206,184 actually received.

| Year | Amount |
|---|---|
| 1969 | $24,897.58 |
| 1970 | 81,975.95 |
| 1971 | 109,991.94 |
| 1972 | 75,128.84 |
| | 291,994.31 |

The Dunlaps claimed 83.6 percent of the above amounts as interest expense deductions for the taxable years 1969 through 1972, inclusive. The amounts claimed for the years in issue are not in dispute.

From August 1969 to July 1, 1971, Dunlap and Weil received the following interest income in the years identified from the $4,150,000 worth of Hawkeye 5¾-percent convertible secured notes issued by Hawkeye:

| Year | Amount |
|---|---|
| 1970 | $238,625 |
| 1971 | 238,625 |
| | 477,250 |

The Dunlaps reported 83.6 percent of the above amounts as interest income in 1970 and 1971. The amount reported for the year in issue, 1971, is not in dispute.[7]

In 1972, the Dunlaps received the following amounts (their 83.6-percent proportional share) from Hawkeye in accordance with paragraph 2 of the 1971 purchase agreement:

| Subparagraph | Amount |
|---|---|
| 2(a) (promissory notes) | $1,559,981 |
| 2(b) (9½% interest on promissory notes from July 1, 1971, to June 30, 1972) | 148,199 |
| 2(b) (cash at closing) | 1,844,370 |
| 2(c) (sellers' expenses in carrying the Jasper stock from July 1, 1971, to July 12, 1972) | 125,286 |
| | 3,677,836 |

On their 1972 return, the Dunlaps reported long-term capital

---

[7]Hawkeye claimed interest expense deductions in 1969, 1970, and 1971 for the interest accrued and paid on these 5¾-percent convertible secured notes.

gain on the sale of their proportional share of the Jasper stock as follows:

| | |
|---|---|
| Sales price ............................................ | $3,669,727 |
| Less: | |
| Cost ................................................. | (3,404,351) |
| Long-term capital gain ........................... | 265,376 |

The sales price represented the Dunlaps' share ($3,677,836) of the amount received from Hawkeye, less $8,109.[8]

In his statutory notice for 1972, respondent determined that the $148,199 and $125,286 received by the Dunlaps pursuant to paragraphs 2(a) and 2(c), respectively, of the 1971 purchase agreement represented ordinary income and not capital gain income. Accordingly, respondent increased the Dunlaps' ordinary income by $148,199 and $125,286 and decreased the Dunlaps' capital gain by $265,376 based on the determination that the Dunlaps did not realize any capital gain or loss on the sale.

## Expenses Incurred To Acquire
## Controlling Interests of Other Corporations

Hawkeye's total book capitalization in banking subsidiaries as of January 1 and December 31, 1971, was as follows:

| Name of banking subsidiary | 1/1/71 | 12/31/71 |
|---|---|---|
| Burlington Bank & Trust ............. | $2,354,311.40 | $2,578,659.10 |
| First National Bank, Clinton ...........| 2,133,240.00 | 2,216,562.00 |
| Houghton State Bank ..................... | 1,944,124.20 | 1,922,135.58 |
| Lyon County State Bank .................. | 677,299.00 | 634,884.00 |
| Pella National Bank ..................... | 1,323,900.00 | 1,370,527.00 |
| Glenwood Banshares (Mills County State Bank) ............................... | 265,000.00 | 488,885.13 |
| Spencer Banshares (Clay County National Bank) ............................ | 29,447.00 | 29,447.00 |
| Total ..................................... | 8,727,321.60 | 9,241,099.81 |

The increases in investment in Burlington Bank & Trust, Pella National Bank, and First National Bank of Clinton resulted from the acquisition of minority stock holdings and adjustments

---

[8]The $8,109 was apparently for legal fees; however, there is no evidence in the record to support this assertion by petitioners.

to reflect timing differences in the reserve for bad debts. During the years in issue, Hawkeye had standing offers to buy all the minority stock of its controlled banks. The effort to acquire minority holdings involved writing a check or honoring a sight draft; there were no negotiations connected with these acquisitions. During 1971, Hawkeye issued 21 checks to acquire minority shareholdings.

The decreases in the investment in Houghton State Bank and Lyon County State Bank were due to adjustments to reflect bad debt timing differences. The increase in the capitalization of Glenwood Banshares (Glenwood) was due to the liquidation of Glenwood. The liquidation did not involve the negotiation of contracts. During 1971, Hawkeye negotiated for and contracted to buy the Citizens National Bank of Boone (Citizens) and the First Federal State Bank (First Federal). Also in that year, Hawkeye executed the rescission agreement, the 1971 purchase agreement, and related agreements with Dunlap and Weil.

The following table represents the total amount expended by Hawkeye during 1971 for the various items described, the total amount claimed as expenses on Hawkeye's income tax return for 1971, and the total amount capitalized:

| Description | Total expenditures | Expensed | Capitalized |
|---|---|---|---|
| Interest | $231,266.00 | $231,266 | 0 |
| Compensation: | | | |
| Officers | 72,833.00 | 64,874 | $7,959.00 |
| Others | 33,970.00 | 30,957 | 3,013.00 |
| Repairs (car) | 339.00 | 339 | 0 |
| Contributions: | | | |
| Iowa College Foundation | 400.00 | 400 | 0 |
| Amortization: | | | |
| Convertible debt | 1,600.00 | 1,600 | 0 |
| Organizational expenses | 425.00 | 425 | 0 |
| Depreciation: | | | |
| Car | 2,239.00 | 2,239 | 0 |
| Furniture and fixtures | 1,249.00 | 1,249 | 0 |
| Bank trailer | 2,909.00 | 2,909 | 0 |
| Advertising | 11,862.00 | 11,862 | 0 |
| Pension | 8,097.00 | 8,097 | 0 |
| Employee benefits | 2,775.00 | 2,775 | 0 |
| Insurance | 497.00 | 497 | 0 |

| | | |
|---|---|---|
| Travel ............................... $23,704.15 | $23,562 | $142.15 |
| Communications ...................... 10,181.00 | 10,181 | 0 |
| Supplies and printing ............. 18,910.05 | 9,984 | 8,926.05 |
| Stock transfer fees ................. 10,485.00 | 10,485 | 0 |
| Directors' fees ........................ 5,175.00 | 5,175 | 0 |
| Dues and subscriptions ............ 2,291.00 | 2,291 | 0 |
| Miscellaneous ......................... 2,308.00 | 2,308 | 0 |
| Filing fees ............................. 2,381.00 | 0 | 2,381.00 |
| Accounting ........................... 40,048.97 | 5,819 | 34,229.97 |
| Legal .................................... 57,686.23 | 25,352 | 32,334.23 |
| Taxes .................................... 3,806.00 | 3,806 | 0 |
| Total ............................. 547,437.40 | 458,452 | 88,985.40 |

The printing, accounting, legal, and filing fee costs that were capitalized related to the acquisition of banks and to the preparation of a registration statement filed with the Securities and Exchange Commission in conjunction with a prospectus issued in 1972.

Approximately 2 weeks of Dunlap's salary and 3 months' salary of two other Hawkeye employees were capitalized to reflect their efforts in acquiring Citizens and First Federal and for their work in processing the Federal Reserve Board applications. Dunlap negotiated with the Citizens' directors in 1 day. Within 1 or 2 days thereafter, Hawkeye had signed contracts and made tender offers to all of Citizens' shareholders. Dunlap's negotiation efforts in acquiring First Federal consisted of two meetings with First Federal's owner, Maurice Stephens, plus the writing of a 6-page memorandum explaining the difficulties Stephens would encounter in trying to form his own bank holding company.

Hawkeye's total book capitalization in banking subsidiaries as of January 1 and December 31, 1972, was as follows:

| Name of banking subsidiary | 1/1/72 | 12/31/72 |
|---|---|---|
| Burlington Bank & Trust ................$2,578,659.10 | | $2,549,720.10 |
| First National Bank ........................ 2,216,562.00 | | 2,397,766.00 |
| Houghton State Bank ...................... 1,922,135.58 | | 1,965,477.58 |
| Lyon County State Bank ................... 634,884.00 | | 677,298.00 |
| Pella National Bank ...................... 1,370,527.00 | | 1,366,434.00 |
| Glenwood Banshares ......................... 488,885.13 | | 501,139.13 |
| Spencer Banshares (Clay County National Bank) ................................29,447.00 | | 1,530,151.00 |
| Jasper County Savings Bank ................................5,080,832.00 | | |
| State Co. (State Bank & Trust) ..............................1,267,175.00 | | |

1394

Camanche State Bank ......................................... $200,232.45
First Federal State Bank ...................................... 1,463,000.00
Citizens National Bank ........................................ 1,300,000.00
   Total ....................................... 9,241,099.81   20,299,225.26

The decrease in the capitalization of Burlington Bank & Trust and Pella National Bank was due to adjustments to reflect bad debt timing differences. The increase in investment in First National Bank, Houghton State Bank, and Lyon County State Bank was due to the acquisitions of minority stock holdings and adjustments to reflect bad debt timing differences. The increase in the capitalization of Glenwood Banshares was due to the acquisition of a small minority interest.

The investment increases in Spencer Banshares, Jasper County Savings Bank, State Co., Camanche State Bank, First Federal State Bank, and Citizens National Bank resulted from consummation of outstanding bank acquisition contracts. Prior to 1972, Hawkeye executed the contracts and submitted applications connected with these acquisitions. Hawkeye did not negotiate any new contracts in 1972.

The following table represents the total amount expended by Hawkeye during 1972 for the various items described, the total amount claimed as expenses on Hawkeye's income tax return for 1972, and the total amount capitalized:

| Description | Total expenditures | Expensed | Capitalized |
|---|---|---|---|
| Interest .......................... | $322,727.00 | $322,727 | 0 |
| Compensation: | | | |
|   Officers .......................... | 101,567.00 | 101,567 | 0 |
|   Others .............................. | 33,279.00 | 33,279 | 0 |
| Rent .................................... | 11,503.00 | 11,503 | 0 |
| Contributions: | | | |
|   Iowa College Foundation ........ | 2,500.00 | 2,500 | 0 |
| Taxes .................................. | 4,438.00 | 4,438 | |
| Amortization: | | | |
|   Deferred Financing ................ | 1,600.00 | 1,600 | 0 |
| Depreciation: | | | |
|   Buildings ............................ | 735.00 | 735 | 0 |
|   Car .................................... | 2,362.00 | 2,362 | |
|   Furniture and fixtures .......... | 9,674.00 | 9,674 | 0 |

Marketing-advertising:

| | | | |
|---|---:|---:|---:|
| Public relations | $24,029.00 | $24,029 | 0 |
| Dues, etc. | 8,364.00 | 8,364 | 0 |
| Pension | 9,289.00 | 9,289 | 0 |
| Other employee benefits | 2,824.00 | 2,824 | 0 |
| Travel | 31,591.86 | 30,717 | $874.86 |
| Communications | 24,680.00 | 24,680 | 0 |
| General office | 23,216.00 | 23,216 | 0 |
| Legal fees and other professional fees | 124,849.30 | 57,405 | 67,444.30 |
| Accounting | 86,986.25 | 47,318 | 39,668.25 |
| Stock transfer fees | 8,108.00 | 8,108 | 0 |
| Loan discount committee | 2,850.00 | 2,850 | 0 |
| Directors' fees | 6,700.00 | 6,700 | 0 |
| Moving expenses | 9,286.00 | 9,286 | 0 |
| Utilities | 1,562.00 | 1,562 | 0 |
| Miscellaneous | 9,404.61 | 3,127 | 6,277.61 |
| Filing fees | 8,442.46 | 0 | 8,442.46 |
| Printing | 61,012.50 | 0 | 61,012.50 |
| Underwriter fees | 424,000.00 | 0 | 424,000.00 |
| Total | 1,357,579.98 | 749,860 | 607,719.98 |

Hawkeye capitalized the legal and accounting fees connected with the six acquisitions that Hawkeye consummated in 1972.

In November 1972, Hawkeye made a public offering of 530,000 shares of its common stock. The net cash proceeds from the sale of this stock, estimated at $4,984,187, were to be used to retire substantially all the short-term indebtedness incurred or assumed in connection with the acquisitions of the Jasper County Savings Bank, State Co., Camanche State Bank, and First Federal State Bank. In addition to the offering of the 530,000 shares for cash sale, Hawkeye's offer included an exchange offer of 246,000 shares of its common stock for 100 percent of the common stock of Citizens National Bank and 108,420 shares of its common stock for minority common stock interests in four majority-owned constituent banks. The majority of the work done in preparing the prospectus and in filing the registration statement with the Securities and Exchange Commission was performed by outside accountants, underwriters, and attorneys. The costs related to their services were capitalized.

Hawkeye's total book capitalization in banking subsidiaries as of January 1 and December 31, 1973, was as follows:

| Name of banking subsidiary | 1/1/73 | 12/31/73 |
|---|---|---|
| Burlington Bank & Trust | $2,549,720.10 | $2,567,460.10 |
| First National Bank | 2,397,766.00 | 2,880,828.50 |
| Houghton State Bank | 1,965,477.58 | 2,078,477.58 |
| Lyon County State Bank | 677,298.00 | 677,298.00 |
| Pella National Bank | 1,366,434.00 | 1,609,434.00 |
| Glenwood Banshares | 501,139.13 | 502,439.13 |
| Jasper County Savings Bank | 5,080,832.00 | 5,080,832.00 |
| State Co. (State Bank & Trust) | 1,267,175.00 | 1,664,775.00 |
| Spencer Banshares (Clay County National Bank) | 1,530,151.00 | 1,771,461.28 |
| Camanche State Bank | 200,232.45 | 342,282.45 |
| First Federal State Bank | 1,463,000.00 | 1,463,000.00 |
| Citizens National Bank | 1,300,000.00 | 1,300,000.00 |
| Farmers Savings Bank | | 1,068,177.65 |
| Total | 20,299,225.26 | 23,006,465.69 |

The increases in capitalization shown above for all banks except Farmers Savings Bank were due to acquisitions of minority stock holdings. Hawkeye issued 31 checks (or honored sight drafts) in conjunction with these acquisitions. The Farmers Savings Bank at Grundy Center, Iowa, was a new acquisition. During 1973, Hawkeye contracted for the purchase of this bank, made application to the Federal Reserve Board for approval, and consummated the acquisition. The negotiations for the purchase of Farmers Savings Bank took only 1 or 2 days because the bank was owned by Maurice Stephens with whom Dunlap had had various prior dealings. There were not any other negotiations for bank acquisitions during 1973.

The following table represents the total amount expended by Hawkeye during 1973 for the various items described, the total amount claimed as expenses on Hawkeye's income tax return for 1973, and the total amount capitalized:

| Description | Total expenditures | Expensed | Capitalized |
|---|---|---|---|
| Interest | $810,342 | $810,342 | 0 |
| Compensation: | | | |
| Officers | 189,150 | 189,150 | 0 |
| Others | 59,403 | 56,507 | $2,896 |
| Rents (occupancy costs) | 51,974 | 51,974 | 0 |
| Taxes | 9,522 | 9,522 | 0 |
| Contributions | 3,890 | 3,890 | 0 |
| Amortization | 1,600 | 1,600 | 0 |

| | | |
|---|---|---|
| Depreciation ...........................$22,007 | $22,007 | 0 |
| Advertising ............................ 32,673 | 32,673 | 0 |
| Pension .................................. 18,304 | 18,304 | 0 |
| Employee benefits ..................... 6,528 | 6,528 | 0 |
| Travel and entertainment ........... 30,230 | 30,230 | 0 |
| Communications ....................... 25,943 | 25,943 | 0 |
| General office expenses ............. 12,494 | 12,494 | 0 |
| Insurance ................................. 137 | 137 | 0 |
| Legal fees .............................. 30,477 | 28,565 | $1,912 |
| Accounting fees ....................... 13,674 | 13,674 | 0 |
| Stock transfer fees ................... 12,268 | 12,268 | 0 |
| Directors' and advisory committee fees ....................... 14,975 | 14,975 | 0 |
| Meetings and school expense ...... 11,377 | 11,377 | 0 |
| Moving expense ..........................2,724 | 2,724 | 0 |
| Miscellaneous expense ................ 16,353 | 16,353 | 0 |
| Total .............................. 1,376,045 | 1,371,237 | 4,808 |

The $2,896 in capitalized compensation represented salary paid for the writing of the Federal Reserve Board application for the acquisition of Farmers Savings Bank. The $1,912 in capitalized legal fees was paid to Hawkeye's Washington, D.C., legal counsel for assistance in Federal Reserve Board application negotiations. The total $4,808 capitalized was added to Hawkeye's Farmers Savings Bank investment account.

Dunlap traveled to Chicago for Hawkeye during 1971, 1972, and 1973 to discuss different pending acquisitions with the Chicago Office of the Federal Reserve Board. During the years in issue, Dunlap's primary duty for Hawkeye consisted of managing constituent banks. In 1973, Dunlap received a $75,000 salary from Hawkeye.

For the years in issue, Hawkeye incurred the following total expenditures, capitalized the portion indicated, and claimed the remainder as business expense deductions on its income tax returns:

| Year | Total expenditures | Capitalized | Expensed |
|---|---|---|---|
| 1971 | $547,437.40 | $88,985.40 | $458,452 |
| 1972 | 1,357,579.98 | 607,719.88 | 749,860 |
| 1973 | 1,376,045.00 | 4,808.00 | 1,371,237 |

In his statutory notice, respondent disallowed $29,671, $348,622, and $131,114 claimed by Hawkeye as business expense

deductions in 1971, 1972, and 1973. Respondent determined that these amounts should have been capitalized, in addition to the amounts previously capitalized by Hawkeye, as costs of acquiring controlling interests in other corporations. Respondent's determination was based upon an allocation of expenditures to the acquired corporations during the years in issue calculated using the following formula:

$$\frac{\text{Capitalized book value of bank stocks acquired during the year}}{\text{Total book capitalization of bank stocks on hand at end of year}} \times \text{Adjusted overhead costs for the year}$$

"Adjusted overhead costs" included selected costs for compensation, rents, interest, contributions, amortization, depreciation, advertising, pension benefits, employee benefits, and other expenses.

## Lapse of Option

On April 1, 1972, Hawkeye contracted with Stephens Industries, Inc., to lease office space on the sixth floor of the Stephens Building, located at 319 Seventh Street, Des Moines, Iowa. Stephens Properties, Inc., was at that time controlled by Morris Stephens, a director and treasurer of Hawkeye.

On July 12, 1972, Hawkeye entered into an option agreement with Stephens Industries, Inc., to purchase the Stephens Building. This agreement provided:

### OPTIONS

IN CONSIDERATION of Thirty-five Thousand Dollars ($35,000.00) per option for ten (10) separate options, or an aggregate amount of Three Hundred Fifty Thousand Dollars ($350,000.00), receipt of which aggregate amount is hereby acknowledged, STEPHENS INDUSTRIES, INC., of Des Moines, Iowa (hereinafter sometimes referred to as "Optionor"), hereby grants to HAWK-EYE BANCORPORATION, an Iowa corporation (hereinafter sometimes referred to as "Hawkeye"), ten (10) separate options to buy the following described real estate in the County of Polk, State of Iowa, to-wit:

The West Half (W-½) of Lots One (1) and Two (2), in Block Twelve (12), in the Town of Fort Des Moines, now included in and forming a part of the City of Des Moines, Iowa, together with all improvements, equipment and fixtures thereon, and appurtenances thereto belonging.

The aforesaid options shall be subject to the following terms and conditions.
1. *Consideration Subject to Refund But Not Subject to Credit.* In the event

an option is exercised, amounts paid to Optionor for options neither exercisable nor expired which options were granted herein shall be refunded, as set forth in paragraph 2 below, however, in no event shall any amount paid for any option be credited on the purchase price hereinafter provided.

2. *Schedule of Exercise Dates, Base Prices and Refund Amounts for Each Option.* Set forth immediately below are the respective effective dates, expiration dates, base prices and amount of option refunds for each respective option granted herein.

| Option number | Effective date | Expiration date | Base price | Amount of option refunds |
|---|---|---|---|---|
| 1 | July 12, 1972 | July 11, 1973 | $2,000,000 | $315,000 |
| 2 | July 12, 1973 | July 11, 1974 | 2,000,000 | 280,000 |
| 3 | July 12, 1974 | July 11, 1975 | 2,000,000 | 245,000 |
| 4 | July 12, 1975 | July 11, 1976 | 2,000,000 | 210,000 |
| 5 | July 12, 1976 | July 11, 1977 | 2,000,000 | 175,000 |
| 6 | July 12, 1977 | July 11, 1978 | 2,000,000 | 140,000 |
| 7 | July 12, 1978 | July 11, 1979 | 2,000,000 | 105,000 |
| 8 | July 12, 1979 | July 11, 1980 | 2,000,000 | 70,000 |
| 9 | July 12, 1980 | July 11, 1981 | 2,000,000 | 35,000 |
| 10 | July 12, 1981 | July 11, 1982 | 2,000,000 | 0 |

3. *Computation of Purchase Price.* The purchase price of the property herein described shall be computed as of the date of the exercise of the particular option by application of the following formula. The purchase price shall be the sum of the base price as set forth in paragraph 2 above; plus expenses of remodeling incurred after completion of the present remodeling program of the entire building (only those expenditures which under the Internal Revenue laws of the United States are required to be capitalized shall be included in the definition of the term "expenses of remodeling"), less depreciation allowed or allowable under the Internal Revenue laws; plus, in the event of partial or total destruction to the building or the land above-described and if rebuilding costs exceed insurance proceeds received for such destruction, the purchase price shall be increased by the amount of such excess.

4. *Exercise of an Option.* Notice of the exercise of any option granted herein may be given by Hawkeye at any time between and including the effective date and expiration date of an option. Notice of exercise shall be accompanied with payment of the full purchase price and shall specify the date of possession desired which shall be not sooner than the first day of the second calendar month succeeding that in which the notice is given and not later than the first day of the fourth such succeeding month.

5. *Settlement Provisions.*

A. Immediately upon receipt of notice of exercise of an option, Optionor shall cause the abstract of title to the property to be continued to date and submitted to Hawkeye for approval. Any matters required to correct the title shall be done at Optionor's expense as soon as practicable. Title shall be merchantable as defined by the Iowa Bar Association land title standards.

B. Taxes for the current year payable in the following year shall be prorated to the date of possession. Cost of insurance shall be prorated to the

date of possession. All other costs and expenses, if not incurred on a calendar month basis, shall be prorated to the date of possession.

C. Hawkeye may assume as part of the purchase price any mortgage or other lien upon the premises as part of the purchase price if the terms of the lien instrument permit the same. To the extent not so offset, the balance of the purchase price shall be payable in cash.

6. *General Terms and Conditions.*

A. Optionor may freely mortgage or otherwise pledge the building and improvements thereon without the consent of Hawkeye.

B. If the premises shall be partly destroyed by fire so as to be capable of being rebuilt with the insurance money available, Optionor shall cause the premises to be rebuilt. If at the time of any fire, there is any mortgage or other lien instrument effective which contains provisions relating to the matter of rebuilding following a fire or other disaster, the terms of that instrument shall be controlling notwithstanding anything in this agreement.

7. *Assignment.* This agreement may be freely assigned by Optionor, who agrees in case of assignment that it will cause its successor in interest to agree to be bound by all the terms and conditions hereof. Optionor agrees that in event of transfer or conveyance of the property herein described, that it will cause its grantee, or transferee, or purchaser, under contract, to acknowledge the effectiveness and validity of this agreement to Hawkeye or its successor.

Hawkeye paid $350,000 to Stephens Industries at the time the option agreement was executed. Hawkeye did not acquire the building during 1972 or 1973.

On its income tax return for 1973, Hawkeye claimed a $35,000 income tax deduction for the loss resulting from a lapsed option. In his statutory notice, respondent disallowed the entire deduction based on his determination that the option in question did not lapse during 1973.

### *Depreciation Expense Claimed by Dunlap*

In 1973, Safeway Stores, Inc. (Safeway), was the second largest grocery retailer in the United States. Sometime prior to March 15, 1973, Safeway designed and built, according to its specifications and under its supervision, an integrated division office, a warehouse, and a distribution center on approximately 60 acres of land in El Paso, Tex. This facility (the Warehouse Distribution Center) consists of a group of six contiguous buildings (grocery warehouse, perishable goods warehouse, meat depot, frozen foods warehouse, refrigeration buildings, and a battery-charging and machine shop building) with three rail spurs (two enclosed in the grocery warehouse and one between the frozen food warehouse and meat depot). In addition, there

are three free-standing buildings (truck repair shop, traffic control/drivers' rest building, and a two-story divisional office building). The 60-acre site is extensively paved for parking, illuminated for night operations, enclosed by a fence with remote-controlled turnstile gates for employees and a guard house for vehicular and cargo security. The site also includes ponding basins and a water tank for fire control purposes. The cost of the facility was allocated as follows:

| Description | Amount |
|---|---|
| Buildings | $6,572,589 |
| Equipment | 207,669 |
| Site improvements | 1,619,742 |
| Land and selling expense | 400,000 |
| Total | 8,800,000 |

On March 12, 1973, Safeway conveyed title to the 60 acres of real property by warranty deed to El Paso Properties, Corp. (El Paso Properties) for $8,800,000.

El Paso Properties is a single purpose financing corporation, 100-percent owned by Janus Leasing & Development Corp. (Janus Leasing). El Paso Properties was created to accommodate the Texas insurance and usury law requirements accompanying a sale-leaseback transaction. Specifically, El Paso Properties was organized to acquire title to the Warehouse Distribution Center, to secure financing of the purchase price of the property, to arrange a leaseback of the property to Safeway, and to transfer title of the property and the lease agreement to individual investors.

On or about March 15, 1973, Dunlap received a confidential memorandum about this investment from Janus Leasing. Janus Leasing was seeking to sell 10 Investor Units at $38,700 each for which each investor would receive a 10-percent undivided interest as a tenant-in-common in the Warehouse Distribution Center.

The memorandum describing this investment opportunity provided in part:

I. THE TRANSACTION

This memorandum summarizes the details of a net lease investment opportunity. The investment should be of particular interest to anyone who is paying income taxes at the rate of 50% or more. It should be possible for such individuals or corporations to obtain substantial economic benefits from the

ownership of the Property [Warehouse Distribution Center] while assuming only nominal economic risks.

As a part of one composite closing, Safeway Stores, Incorporated ("Lessee") will transfer the title to the Property described herein to a newly-formed financing corporation ("El Paso Properties Corporation") which will, on behalf of the Purchaser(s), lease the Property to the Lessee under the terms of a completely net lease for 25½ years and arrange the mortgage financing of the Property through the issuance of a First Mortgage and Deed of Trust (the "Mortgage") in the principal amount of $8,412,947. As additional security for the mortgage lenders, El Paso Properties Corp. will assign all its right, title and interest in and to the Lease to The National Shawmut Bank of Boston, as Trustee under the Mortgage. Simultaneously therewith, the Purchasers (Owners) will acquire the Property from the financing corporation subject to the Mortgage, the Lease and the Assignment of Lease. The Mortgage will be non-recourse (*no personal liability*) to the Owners and the rent payable under the net lease will be sufficient to repay 100% of the mortgage, with interest, during the 25½ year lease term.

Under present law, the Purchasers, as Owners of the Property, will be entitled to receive all of the income, profits and losses generated by or to be derived from the Property which should have a substantial residual value when the Mortgage is fully amortized in approximately 25½ years. In addition, an Owner in the 50% or higher tax bracket should receive, under present law, substantial economic benefits from the combination of cash flow plus the tax losses produced, in the early years of ownership of the Property, by high depreciation charges and interest on the Mortgage. These tax losses are ordinary deductions and can be used to offset other income. Consequently, when tax effects and the time value of money, through the utilization of such tax losses at a 4% after tax rate of return, are considered, the minimum rate of return on the $387,000 cash equity investment, based upon the important assumptions contained in the Projections of Financial Analysis attached hereto, is anticipated to be 34.5% after taxes to an Owner in the 60% tax bracket and 20.8% after taxes to an Owner in the 50% tax bracket.

It should be noted that the anticipated rates of return to the Owner may be substantially higher than those set forth herein in the event that the Property is refinanced following the 12th year of the Lease Term, or if the Owner is able to earn in excess of 4% after taxes on the excess funds which are available prior to the time when tax payments resulting from this transaction become due or if the Property is sold for more than the projected amount or if the Owner's tax bracket is in excess of that projected.

    *      *      *      *      *      *      *

B. The total cost of the Property is expected to be approximately $8,800,000 of which $392,000 is allocable to land.

The total cash investment required from the Purchaser(s) is $387,000 and the remaining $8,413,000 will be financed through nonrecourse borrowings (*no personal liability to the Owner*). The estimated Property costs will be capitalized as follows:

|          | Costs       |          | Financing |
|----------|-------------|----------|-----------|
| Land ................... | $392,000 | Equity ................. | $387,000 |
| Buildings and |  |  |  |
| related facilities ... | 8,408,000 | Mortgage ............. | 8,413,000 |
|          | 8,800,000   |          | 8,800,000 |

C. *Cash Equity Investment*

Based upon the estimated total Property Cost of $8,800,000 the Purchaser(s) will be required to make a total cash investment of $387,000 ($38,700 per Investor Unit) which is payable as follows:

> Cash Investment:
> *Amount*—$387,000 ($38,700 per Investor Unit)
> *When paid*— Upon the execution of the Subscription
> Agreement in the form attached hereto.

The Subscription Agreement provides for variances in the event that Property Cost exceeds or is less than $8,800,000. The cash equity investment shall be adjusted at the same ratio as $387,000 is to $8,800,000 after taking into consideration the prior payment of $387,000.

Within 90 days following the closing of the transaction, Janus Leasing & Development Corporation shall furnish the Purchaser with a schedule of Property Cost, the depreciation schedule and notice of any adjustment in the cash investment payment.

A person will be considered as a Purchaser by Janus Leasing & Development Corporation upon the execution of the following:

(1) The Subscription Agreement in the form attached hereto.

(2) The Assumption Agreement to maintain the corporate existence of the borrowing corporation and pay the nominal expenses related thereto.

(3) The Management Agreement whereby Janus Leasing & Development Corporation will provide administrative and financing services to the Purchaser. Under such Agreement, Janus Leasing & Development Corporation or its designee will provide all financing and refinancing services associated with the Property. In addition, Janus Leasing & Development Corporation shall have the right of first refusal upon a bona fide sale. And,

(4) Upon remitting a certified or cashier's check for the requisite first cash investment payment payable to the order of Merrill Lynch, Pierce, Fenner & Smith, Incorporated to Herrick, Langdon, Belin & Harris, 300 Home Federal Building, Des Moines, Iowa 50309, Attention: David Belin, Esquire. Reference is made to the attached Subscription Agreement for precise terms and further instructions.

Merrill Lynch, Pierce, Fenner & Smith, Incorporated shall hold the Purchasers' funds in escrow until the closing. Upon the transfer of title to the Property from the Lessee to the Purchasers, Janus will direct the disbursement of the Purchasers' funds to the Lessee.

D. *Mortgage Financing Terms*

At the time of the closing, which is estimated to occur during March, 1973, the First Mortgage and Deed of Trust on the Property will be recorded as a first lien subject to certain exceptions in an approximate amount of $8,413,000.

Such Mortgage shall provide for the issuance of $8,413,000, Secured Notes to The National Shawmut Bank of Boston as Trustee. Such Secured Notes shall be secured by the Mortgage and the Assignment of Lease. Terms of the Mortgage provide for 102 payments, payable quarterly in arrears, of principal and interest sufficient to amortize, with interest, 100% of the Secured Notes by maturity. The Secured Notes will be non-callable for 12 years following the closing, and thereafter, will be callable at par plus a premium of 4.00% commencing in the 13th year and declining in equal annual amounts to 0% in the 25th year.

E. *Principal Provisions of the Lease and Assignment of Lease*

*Lessor:* El Paso Properties Corp. will be the Lessor of the Property on the Lease to Safeway Stores, Inc. but will, however, immediately transfer all of its interest to the Purchasers as owners of the Property.

> *Owner:* The Purchasers.
> *Lessee:* Safeway Stores, Inc. ("Safeway")

\*     \*     \*     \*     \*     \*     \*

C. *Risk Factors*

In analyzing the investment described in this Memorandum, the following risk factors inherent in a transaction of this type should be carefully considered:

*Credit Risk:* In the event of the bankruptcy, insolvency or other inability of Safeway to pay, when due, the rent due under the Lease of the Property, the Trustee for the owners of the Secured Notes may foreclose on the Property under the First Mortgage and Deed of Trust resulting in a possible loss to the Owners.

*Tax Risk:* Adjustments to the useful life of the Property or treatment of certain items as filed by the Owners for federal income tax purposes or changes in or subsequent interpretations of existing federal tax laws may result in material adverse consequences to the Owners through their ownership interest in the Property.

\*     \*     \*     \*     \*     \*     \*

III. JANUS LEASING & DEVELOPMENT CORPORATION

Janus Leasing & Development Corporation is a Delaware corporation, headquartered at 515 Madison Avenue, Suite 2600, New York, New York 10022. Janus Leasing & Development Corporation specializes in structuring and analyzing real estate investment opportunities and providing administrative services to property owners. The sole owners and principal officers of Janus Leasing & Development Corporation are P. Douglas Freedle, President and Charles R. Koons, Executive Vice President. Prior to joining Janus Leasing & Development Corporation, Messrs. Freedle and Koons were associated with the New York, New York offices of Lybrand, Ross Bros. & Montgomery and Goldman, Sachs & Company, respectively, performing activities similar to the present business of Janus Leasing & Development Corporation.

On March 15, 1973, Dunlap subscribed for three 10-percent shares of the investment described in the Janus Leasing

memorandum. Pursuant to the terms of the subscription agreement, Dunlap made a $116,100 cash payment for the three $38,700 units as a tenant-in-common in the Warehouse Distribution Center. Dunlap's check for the $116,100 was issued in favor of Merrill Lynch, Pierce, Fenner & Smith, who in turn disbursed the same amount to Safeway. Dunlap's subscription was accepted and confirmed by Janus Leasing. Seven other individual investors subscribed to 10-percent interests. The total $387,000 cash investment made by the eight investors was forwarded to Safeway. Although he was fully aware of the tax consequences of his investment, Dunlap also was motivated to make the investment because he felt that the town of El Paso had tremendous potential and because he believed that the land on which the facility was located would appreciate in value.

Simultaneous with the purchase of the Warehouse Distribution Center and the leaseback of the premises to Safeway, El Paso Properties arranged for the financing of the purchase price of the Warehouse Distribution Center not covered by the cash payments of the eight individual investors, i.e., $8,800,000 less the $387,000, or approximately $8,413,000, through the placing of its series A, B, and C secured notes with various institutional investors. The series A, B, and C secured notes had the following interest rates, aggregate principal amounts, and maturities:

| Series | Interest rate | Aggregate principal amount | Maturity date |
|---|---|---|---|
| Series A | 7.25 percent | $694,214 | Oct. 1, 1978 |
| Series B | 7.50 percent | 1,000,480 | Oct. 1, 1983 |
| Series C | 7.70 percent | 6,718,253 | Oct. 1, 1998 |
| Total | | 8,412,947 | |

Under all of the series A secured notes, the following amounts of interest and principal (rounded to the nearest dollar) were payable on a yearly basis until such notes were paid off in 1978:

| Year | Interest | Principal | Yearly total payment |
|---|---|---|---|
| 1974 | $47,127 | $119,639 | $166,766 |
| 1975 | 38,213 | 128,553 | 166,766 |
| 1976 | 28,138 | 138,628 | 166,766 |

| | | | |
|---|---|---|---|
| 1977 | $18,847 | $147,919 | $166,766 |
| 1978 | 7,291 | 159,475 | 166,766 |
| Total | | 694,214 | |

Under all of the series B secured notes, the following amounts of interest and principal (rounded to the nearest dollar) were payable each year until the notes are paid off in 1983:

| Year | Interest | Principal | Yearly total payment |
|---|---|---|---|
| 1974–78 | $75,036 | 0 | $75,036 |
| 1979 | 70,286 | $171,516 | 241,802 |
| 1980 | 57,057 | 184,745 | 241,802 |
| 1981 | 42,806 | 198,996 | 241,802 |
| 1982 | 27,456 | 214,346 | 241,802 |
| 1983 | 10,925 | 230,877 | 241,802 |
| Total | | 1,000,480 | |

Under all of the series C secured notes, the following amounts of interest and principal (rounded to the nearest dollar) payable each year until the notes are paid off in 1998:

| Year | Interest | Principal | Yearly total payment |
|---|---|---|---|
| 1974–83 | $517,305 | 0 | $517,305 |
| 1984 | 510,230 | $248,877 | 759,107 |
| 1985 | 490,510 | 268,597 | 759,107 |
| 1986 | 469,210 | 289,897 | 759,107 |
| 1987 | 444,718 | 314,389 | 759,107 |
| 1988 | 422,489 | 336,618 | 759,107 |
| 1989 | 395,199 | 363,908 | 759,107 |
| 1990 | 364,811 | 394,296 | 759,107 |
| 1991 | 340,683 | 418,424 | 759,107 |
| 1992 | 295,965 | 463,142 | 759,107 |
| 1993 | 264,698 | 494,409 | 759,107 |
| 1994 | 225,514 | 533,593 | 759,107 |
| 1995 | 183,230 | 575,877 | 759,107 |
| 1996 | 137,586 | 621,521 | 759,107 |
| 1997 | 90,332 | 668,775 | 759,107 |
| 1998 | 33,177 | 725,930 | 759,107 |
| Total | | 6,718,253 | |

The series A, B, and C notes were secured by an indenture of mortgage and deed of trust dated as of March 1, 1973, placing a

first mortgage on the Warehouse Distribution Center;[9] by an assignment of the Safeway lease; and by a security interest in the personal property, buildings, and other structures. By virtue of the indenture of mortgage and deed of trust, the noteholders of the series A, B, and C secured notes have no recourse for the payment of principal or interest thereon other than against El Paso Properties and the trust estate (Warehouse Distribution Center). El Paso Properties agreed to submit to the institutional investors its annual balance sheets and copies of any financial statements or reports distributed to its stockholders or filed with the Securities and Exchange Commission.

On March 15, 1973, El Paso Properties leased the Warehouse Distribution Center to Safeway by lease agreement dated March 1, 1973. The lease agreement included the following terms and conditions:

*Term.*—The lease provided for a preliminary lease term commencing on March 19, 1973, and extending through September 30, 1973. The original term of the lease commenced on October 1, 1973, and runs for 25 years to September 30, 1998. At the end of the original lease term, Safeway has the option to extend the term of the lease for six additional periods of 5 years each. There is no option for further renewal upon the expiration of the sixth renewal term. Safeway can cancel any option term in effect upon giving the lessor 6 months' written notice.

*Rent.*—The rent for the preliminary term was $337,920, of which $179,520 was payable on June 30, 1973, and $158,400 was payable on September 30, 1973. The annual rent payable during the original 25-year term of the lease is $761,507.64, payable in quarterly installments of $190,376.91 commencing on December 31, 1973. During any extended lease term, the rent is $66,000 quarterly ($264,000 annually) commencing on December 31, 1998. Unless otherwise designated by the lessor, rent payments are to be paid directly to the National Shawmut Bank of Boston, as trustee.

*Net lease.*—Safeway agreed to pay all charges for electricity, water, gas, telephone, and other utility services used on the leased premises. Safeway further agreed to pay all taxes,

---

[9]The indenture of mortgage and deed of trust was formally entered into between El Paso Properties and the National Shawmut Bank of Boston and W. B. Wadland, as trustees.

assessments, personal property taxes, water rent, rates and charges, sewer rents, and other governmental impositions of every kind and nature, extraordinary as well as ordinary, during the term of the lease or any renewal.

*Lessee's assumption of liability.*—Safeway agreed to indemnify and save the lessor harmless from any liability, damage, expense, cause of action, suit, claim, or judgment arising from injury to persons or property on the leased premises or upon the adjoining streets and sidewalks.

*Maintenance, alterations, and improvements.*—Safeway is to maintain, repair, replace, and otherwise keep the leased premises in good, safe, and substantial order and condition, except for reasonable ordinary wear and tear. Safeway is permitted to make any alterations or improvements to the leased premises as it desires. At the expiration of the lease, Safeway is not required to restore the leased premises to their original condition, and the lessor is required to accept the property with these improvements or additions, i.e., the improvements or additions become the property of the lessor at the end of the lease term. If Safeway makes improvements during the original term of the lease, and if the cost of these improvements exceeds $500,000, but is less than $8,800,000, Safeway may offer to accept payment from the lessor for the cost. If the lessor accepts Safeway's offer, the parties will increase the amount of rent payable in an amount sufficient to amortize cost of the improvements, together with interest at a rate sufficient to finance the cost, over a term of 15 to 25 years.

*Insurance.*—Safeway is required to maintain workmen's compensation, property damage, and liability insurance. Safeway is also required to maintain fire insurance and extended coverage for the benefit of both itself and the lessor.

*Damage by fire or other casualty.*—In the event of loss or damage to the buildings by fire or other casualty during the preliminary, original, or any renewal term of the lease, Safeway is required to repair or rebuild the damaged buildings. Any cost in excess of insurance proceeds shall be paid by Safeway. If the cost of repair is less than the amount of insurance proceeds, Safeway shall retain the excess insurance proceeds if they are less than $20,000. If the excess proceeds are $20,000 or more, the excess is payable to the lessor, and the rent payable thereafter by Safeway is reduced.

*Premises no longer economically suitable.*—Upon the occurrence of a condemnation or casualty which causes the leased premises, in Safeway's opinion, to become no longer economically suitable for its use, Safeway may terminate the lease. However, termination must be accompanied by an offer from Safeway to purchase the property. If the lessor does not accept Safeway's offer to purchase, the lease terminates, and the lessor will receive the insurance proceeds or condemnation award.

*Easements.*—If during the preliminary, original, and any renewal terms of the lease, the lessor agreed or was required to grant easements affecting the leased premises and to dedicate or convey portions of the leased premises for road, highway, and other public purposes, then any monetary consideration received as the result of the granting of an easement or the dedication or conveyance of any portion of the leased premises is to be paid to Safeway.

*Condemnation.*—If the leased premises are partially condemned without rendering the premises economically unsuitable for Safeway, then Safeway shall retain any excess of the condemnation award over the cost of repairs or alterations made necessary by the condemnation if the excess proceeds are less than $20,000. If the excess award is $20,000 or more, the excess is payable to the lessor, and the rent payable thereafter by Safeway is reduced. If the entire leased premises are condemned during the preliminary or original term of the lease, Safeway may terminate the lease if the notice of termination is accompanied by an offer to purchase the condemnation award. If the lessor does not accept Safeway's offer to purchase, the lease shall terminate and the entire award will be payable to the lessor.

*Bankruptcy.*—If Safeway becomes bankrupt or files under the Bankruptcy Act, it would be in default and in breach of the lease. The lessor is then entitled to recover all future rent discounted to the date of the breach at the rate of 5 percent per annum. In addition, the lessor has the right to require Safeway to purchase the leased property.

*Termination.*—Apart from the termination provisions provided for the separate contingencies of condemnation, casualty, and bankruptcy, Safeway has the right, after the 10th year of the original term, to terminate the lease. In the event of termination, Safeway must offer to purchase the leased premises. If the

lessor decides not to accept Safeway's offer, then the lease shall terminate and all parties will be discharged of their liabilities under the lease. Under these circumstances, Safeway is required to pay rent to the date of termination and shall vacate and remove its property from the premises by the date of termination.

*Purchase price.*—The purchase price for Safeway's offer to purchase the facility upon condemnation, casualty, or termination is set at an amount equal to the discounted present value of the rent payable during the lease term. This price approximated the loan balances outstanding. Upon purchase, the sales proceeds are to be applied against the outstanding notes, and the institutional investors are to remove the lien against the Warehouse Distribution Center.

*Other provisions.*—The lease contains other customary business provisions, which are not relevant to the issues presented.

On March 12, 1973, El Paso Properties and Safeway assigned their lease agreement to the National Shawmut Bank of Boston and W. B. Wadland, as trustees (the trustees), under the trusts created by the indenture of mortgage and deed of trust. This assignment provided in part:

1. El Paso, for a good and valuable consideration, the receipt whereof is hereby acknowledged, in further compliance with the provisions of the Indenture and as additional security for the payment of the principal of, premium, if any, and interest and all other sums payable on, the Notes, and of all other sums payable under the Indenture and for the performance of its obligations in the Indenture and the Notes and herein contained, has assigned, transferred, conveyed and set over, and by these presents does assign, transfer, convey and set over to the Trustees all of (in the case of the Trustee, only to the extent of its legal qualification and capacity under the laws of any jurisdiction to receive and hold property therein for the purposes hereof) El Paso's estate, right, title and interest as lessor in, to and under the Lease, together with all rights, powers, privileges, options and other benefits whatsoever of El Paso under the Lease including, but not by way of limitation, (i) the immediate and continuing right to receive and collect all rents, income, revenues, issues, profits, insurance proceeds, condemnation awards, moneys and security, payable to or receivable by El Paso pursuant to any of the provisions of the Lease, whether as rents or as the purchase price of the Leased Premises (or part thereof or any award payable in connection with a taking thereof) or otherwise, (ii) the right to accept or reject any offer of Safeway to purchase the Leased Premises (or part thereof or any award payable in connection with a taking thereof) pursuant to any provision of the Lease, (iii) the right to require Safeway to purchase the Leased Premises pursuant to Article Fifteenth of the Lease and (iv) the right and power (which right and power are

coupled with an interest) to execute and deliver, as agents and attorneys-in-fact of El Paso, appropriate deeds and any other instruments necessary to convey the Leased Premises to Safeway, and to perform all other necessary or appropriate acts as such attorneys-in-fact, with respect to any such offer of, or right to require, purchase and convey, and the right to make all waivers and agreements, give all notices, consents and releases and other instruments (including, without limitation, the right to accept or reject lessee's offer under Article Sixth of the Lease to accept payment from lessor of the cost of the improvements described thereunder), to take such action upon the happening of a default under the Lease, including the commencement, conduct and consummation of proceedings at law or in equity, as shall be permitted under any provision of the Lease or by law, and to do any and all other things whatsoever which El Paso or any lessor of the Leased Premises is or may become entitled to do under the Lease.

2. Said assignment is executed only as collateral security, and the execution and delivery hereof shall not impair or diminish the obligations of El Paso under the Lease, nor shall any of such obligations be imposed upon the Trustees. Upon the payment of the principal of and all unpaid interest on the Notes and of all other sums payable under the Notes and the Indenture and the performance and observance of the provisions thereof and hereof, said assignment and all rights herein assigned by El Paso, its successors and assigns, to the Trustees shall terminate and all the estate, right, title and interest of El Paso in, to and under the assigned property shall revert to El Paso; provided, that Safeway shall be fully protected in making payments payable to or receivable by El Paso pursuant to any of the provisions of the Lease to the Trustees and otherwise complying with the provisions of said assignment until it shall have received notice in writing from the Trustees that said assignment has terminated.

\* \* \* \* \* \* \*

7. Safeway consents to the foregoing provisions of this Agreement, and agrees to pay and deliver to the Trustee, as hereinabove provided, all rents and other moneys and securities assigned to the Trustees, and to deliver to the Trustee all notices, demands, statements, documents, communications and other instruments whatsoever, or original counterparts thereof, which may be delivered by it under the Lease and to send copies thereof to the lessor under the Lease and to accept from the Trustee all notices, demands, statements, documents, communications and other instruments which the lessor under the Lease may, or is required to, give under the Lease.

\* \* \* \* \* \* \*

9. Safeway agrees that so long as any portion of the Notes remains unpaid and until said assignment shall have terminated pursuant to paragraph 2 hereof, notwithstanding any provisions of the Lease, Safeway will not, and hereby waives its right to, exercise any of the remedies granted to it by the first sentence of the last paragraph of Article Tenth of the Lease.[10]

---

[10]The first sentence of the last paragraph of art. 10th of the lease provides as follows:

"In case Lessor shall default in the performance of any covenant or agreement herein contained, and such default shall continue for thirty (30) days after receipt by Lessor of written

10. El Paso agrees that if, pursuant to the Lease, Safeway shall offer to purchase the Leased Premises (or part thereof or any award payable in connection with a taking thereof), notice of acceptance of any such offer shall be validly given if given by the Trustee, and Safeway agrees that it will recognize a notice of acceptance so given by the Trustee as being validly given. El Paso agrees that if, pursuant to the Lease, El Paso has the right to require Safeway to purchase the Leased Premises, notice of the exercise of such right shall be validly given if given by the Trustee, and Safeway agrees that it will recognize a notice requiring it to purchase the Leased Premises so given by the Trustee as being validly given. Safeway further agrees that it will accept a deed to the Leased Premises executed and delivered by the Trustee as being in compliance with the provisions of the Lease if such deed conveys the title to Safeway which El Paso shall be required to convey to Safeway under the Lease. If it should become necessary for the Trustees or any other party to institute any foreclosure or other judicial proceeding or take any action of any other nature in order to be able to convey such title to the Leased Premises to Safeway, Safeway agrees that, notwithstanding any provisions of the Lease, the time within which delivery of the deed to the Leased Premises may be made shall be extended to the extent reasonably necessary to permit the Trustees or such other party to institute and conduct such judicial proceeding or take such other action, provided, however, that, except as otherwise provided in Article Fifteenth, the Lease shall nevertheless terminate as of the time limited in Article Fourteenth thereof. In the event that the time for the execution and delivery of a deed to the Leased Premises is extended as provided in the preceding sentence, Safeway agrees that upon the execution and delivery of such deed, Safeway will accept such deed, and, upon such acceptance, will pay to the Trustee the purchase price of the Leased Premises if the title thereby conveyed otherwise satisfies the requirements set forth in this paragraph 10. Safeway will, notwithstanding the termination of the Lease and the date of delivery of the deed, pay to the Trustee on the date of termination of the Lease the purchase price which would be required to be paid by Safeway pursuant to Article Fourteenth or Article Fifteenth, as the case may be, of the Lease as of the date of termination of the Lease notwithstanding the date of purchase of the Leased Premises.

\*      \*      \*      \*      \*      \*      \*

12. Safeway will deliver to the Trustee and the registered owners of the Notes at their respective addresses furnished from time to time by the Trustee to Safeway copies of all financial statements sent by Safeway to its stockholders.

---

notice thereof given by Lessee, its agents or attorney, then Lessee, at its option, may (1) cease paying rent for such time as such default shall continue or (2) pay any sums necessary to perform any obligations of Lessor hereunder with respect to which Lessor shall be in default and deduct such sums from the rents thereafter to become due hereunder or (3) declare the term ended and vacate the Leased Premises and be relieved from all further obligations under this Lease."

13. Safeway covenants and represents that:

(a) the construction of the improvements on the Leased Premises (herein termed the Improvements) has been completed and such construction complies with the requirements of all laws, ordinances, rules, regulations and agreements applicable thereto;

\*      \*      \*      \*      \*      \*      \*

(g) there has been no material adverse change in the business condition, financial or otherwise, of Safeway since December 31, 1971;

On March 14, 1973, by special warranty deed effective March 16, 1973, El Paso Properties conveyed an undivided interest as tenant-in-common in the Warehouse Distribution Center to Dunlap and the seven other individual investors. Dunlap received 30 percent of this interest. The interest conveyed by El Paso Properties was subject to: (1) The indenture of mortgage and deed of trust, dated as of March 1, 1973, from El Paso Properties to the trustees; (2) the lease of the Warehouse Distribution Center from El Paso Properties to Safeway, dated as of March 1, 1973; and (3) all other liens, encumbrances, charges, exceptions, and restrictions of record.

On March 19, 1973, Dunlap executed an assumption agreement wherein he assumed and agreed to be bound by all of the provisions of El Paso Properties' lease with Safeway and the assignment of the lease by El Paso Properties to the trustees as security for the series A, B, and C secured notes. Dunlap further agreed to undertake and assume, without releasing El Paso Properties, all of the obligations and undertakings of El Paso Properties contained in the indenture of mortgage and deed of trust, except any obligation to pay interest, premium, or principal on the series A, B, and C secured notes, and any of the obligations contained in the indenture which are imposed upon Safeway under the lease as long as the lease is in effect. Furthermore, Dunlap agreed to cause El Paso Properties to comply with certain obligations under the indenture relating to maintaining its corporate existence, maintaining or causing to be maintained certain insurance, making its financial statements and reports available to the trustees, and maintaining certain negative covenants.

Dunlap and the other seven individual investors entered into a management agreement with Janus Leasing on March 15, 1973. For $2,400 annually, Janus Leasing agreed as follows:

During the term hereof, the Manager [Janus Leasing] shall (a) provide the Owners [individual investors] with all administrative services related to the

organization, qualification and maintenance of the Nominee [El Paso Properties] as a business corporation in good standing under the laws of the State of Delaware in accordance with the terms of the Notes and related to the operations of the Land and all improvements thereon, including but not limited to the keeping of the financial accounts and books and records, the preparation of all tax reports of any nature required under all applicable documents and laws; (b) provide the Owners with all administrative services related to the establishment and operation of procedures and systems connected with the operation of the Land and such improvements on behalf of the Owners; (c) supervise and review on behalf of the Owners all matters concerning the development, construction and erection of the Initial Improvements on the Land [Warehouse Distribution Center] as well as any additions thereto or replacements thereof including, but not limited to, the coordination of the activities of the lessee, the lenders and their respective counsel; (d) supervise and review on behalf of the Owners all matters concerning the financing of the cost of purchase of the Land and construction of the Initial Improvements and any additions thereto or replacements thereof; and (e) generally take any and all action deemed, in the discretion of the Manager, necessary or advisable to carry out its functions on behalf of the Owners hereunder with respect to the Land and all improvements thereon. In connection with such duties, the Manager shall be authorized to collect on behalf of the Owners all payments of rent or other amounts under the Lease as well as any other payments from the operation of the Land and any improvements thereon, to deduct from the same any fee payable to the Manager hereunder and to pay over the remainder in convenient installments to the Owners.

The management agreement also granted Janus Leasing a right of first refusal in the event any of the individual investors desired to sell their interest in the Warehouse Distribution Center. This agreement terminated: (1) Upon the failure of Janus Leasing to effect the completion of the Warehouse Distribution Center on or before June 30, 1973; (2) by agreement of the parties; (3) by written notice of Janus Leasing to the individual investors or; (4) by termination of the lease between El Paso Properties and Safeway.

The useful life for the buildings at the Warehouse Distribution Center is 35 years.

On their income tax return for 1973, the Dunlaps reported a net loss from rents relative to the leasing of the Warehouse Distribution Center as follows:

Total rents ...................................................$101,376
Less:
Depreciation ................................... $104,784

Interest expense ............................ $100,677
Other ................................................ 699

$206,160

Net loss ................................................... (104,784)

On their tax return, the Dunlaps allocated their 30-percent interest in the Warehouse Distribution Center and assigned useful lives as follows:

|  | Amount | Life (years) | Depreciation method (declining balance) | Depreciation claimed for 1973 |
|---|---|---|---|---|
| Building | $1,971,762 | 35 | 150 percent | $70,419 |
| Site improvements | 485,922 | 20 | 150 percent | 30,372 |
| Equipment | 62,301 | 26 | 200 percent | 3,993 |
| Land and selling expense | 120,000 | NA | NA | NA |
| Totals ............... | 2,639,985 |  |  | 104,784 |

In his statutory notice, respondent disallowed $29,339 of the claimed depreciation based on his determination that the depreciable life of the building was 60 years. In an amendment to his answer, respondent determined that the Dunlaps were not entitled to the claimed $104,784 depreciation deduction because Dunlap did not have a depreciable interest in the Warehouse Distribution Center.

OPINION

*Purchase of Jasper County Savings Bank Stock*

A somewhat simplified summary of the facts, qualified by the complete findings and by further details set forth below, may assist in comprehension of a rather tangled set of facts. On, or as of, July 1, 1969, Dunlap and Weil, using money borrowed from independent banks, purchased 93.7 percent of the 5,000 shares of stock of Jasper County Savings Bank (Jasper) at $830 per share. The $830 was payable $166 per share down, and the remainder in five equal annual installments of $132.80 per share, plus interest at 4½ percent. In July 1970, Dunlap and Weil purchased the remaining 6.3 percent. Their total purchase price for all the stock was $4,072,190. Dunlap's and Weil's purpose in making these purchases was for Dunlap and Weil to resell the stock to Hawkeye Bancorporation (Hawkeye), in which Dunlap and Weil were major shareholders. Hawkeye would have made the purchase directly, but prior Federal Reserve Board (F.R.B.)

approval would have been required and the Jasper shareholders were unwilling to wait or to assume the risk of F.R.B. disapproval. On August 5, 1969, Dunlap and Weil agreed with Hawkeye that they would, if and when the F.R.B. approved, resell all 5,000 shares of Jasper to Hawkeye at a price of $830 per share, or for a total of $4,150,000. However, instead of waiting for F.R.B. approval before paying for the stock, Hawkeye paid $4,150,000 to Dunlap and Weil on August 5, 1969. Dunlap and Weil then transferred the funds back to Hawkeye immediately by purchasing $4,150,000 of 5¾-percent Hawkeye notes. It was agreed that if F.R.B. approval were forthcoming, Dunlap and Weil would pay no interest to Hawkeye for their preclosing use of the $4,150,000, unless Jasper's annual earnings fell short of 5 percent of $4,150,000, in which case Dunlap and Weil would have to make up the difference. However, if the F.R.B. did not approve, then Dunlap and Weil would repay the $4,150,000 and keep their Jasper stock but would owe Hawkeye, for the use of the $4,150,000, the greater of 5 percent per annum on the $4,150,000, or the interim net earnings, as defined, of Jasper.

The F.R.B. in March 1971, found the deal to be a proscribed unprecleared indirect acquisition of Jasper by Hawkeye, and insisted that it be rescinded. Accordingly, on July 1, 1971, the deal was recast as follows. Hawkeye, Dunlap, and Weil "rescinded" their earlier agreements. The $4,150,000 was "repaid" to Hawkeye by cancellation of the $4,150,000 of Hawkeye's 5¾-percent notes payable to Dunlap and Weil. Simultaneously, Hawkeye again agreed, subject to prior F.R.B. approval, to buy the Jasper stock for a base price of $4,150,000 (later adjusted at the F.R.B.'s insistence to $4,072,190), and also to pay an amount equal to Dunlap's and Weil's carrying costs from July 1, 1971, to the closing. $2,206,184 plus the carrying costs were to be paid at closing in cash ($2,206,184 being the amount Dunlap and Weil had by then paid the former Jasper shareholders), and the $1,866,006 balance of the base price was to take the form of three promissory notes bearing 9½-percent interest from July 1, 1971, with due dates timed to match the due dates of Dunlap's and Weil's remaining debts to the original Jasper shareholders.

If, and only if, the F.R.B. failed to approve the revised deal, Dunlap and Weil also agreed that they would pay Hawkeye an amount (later computed at $681,507) equal to Jasper's earnings

from July 1, 1969, through June 30, 1971. (No dividends were to be paid by Jasper.)

The F.R.B. approved the revised deal, and it was closed on July 12, 1972. On that date, Hawkeye paid Dunlap and Weil the basic $4,072,190 price—$2,206,184 in cash and $1,866,006 in notes—and in addition paid $177,271, representing interest to June 30, 1972, at 9½ percent on the $1,866,006 notes, and $149,864, representing Dunlap's and Weil's "carrying costs" incurred after June 30, 1971.

### A. $681,507 Interest Income to Hawkeye

The first issue for decision is whether Hawkeye realized $681,507 interest income in 1971 or 1972 in connection with the purchase of Jasper stock.

On August 5, 1969, Dunlap and Weil contracted to sell 5,000 shares of Jasper stock to Hawkeye for $4,150,000. Hawkeye paid Dunlap and Weil the full $4,150,000 at this time. Although the sale was subject to F.R.B. approval, paragraph 4 of this 1969 purchase agreement provided in part:

> In consideration of payment in full for the Bank Shares on the date of execution hereof, and for the right to use said funds, Sellers agree to pay to Buyer as interest therefor, the greater of (1) 5% per annum payable annually on the anniversary of the date hereof or (2) an amount equal to the net earnings of the Bank attributable to the Bank Shares to be sold hereunder from and after July 1, 1969. * * *

If the F.R.B. approved Hawkeye's acquisition of the Jasper shares, and if the annual earnings exceeded 5 percent, Dunlap and Weil were to discharge their obligation under this agreement by their transfer of the Jasper shares to Hawkeye. (The earnings did exceed 5 percent.) On the other hand, if the F.R.B. denied Hawkeye's application or did not grant approval prior to July 1, 1974, Dunlap and Weil were obligated to pay Hawkeye the greater of 5 percent per annum interest or an amount equal to Jasper's undistributed earnings from July 1, 1969.

The parties agree that conditional beneficial ownership vested in Hawkeye under the 1969 purchase agreement and that the provisions of paragraph 4 of this agreement imposed only a contingent liability upon Dunlap and Weil to pay Hawkeye interest. Respondent concedes that while the 1969 purchase agreement was in effect, Hawkeye was, in effect, the beneficial owner of Jasper, hence the indirect owner of the earnings that

accrued to and were retained by Jasper from July 1, 1969, until the F.R.B. rejected the purchase agreement.

When the staff of the F.R.B. took the position that the acquisition as structured under the 1969 purchase agreement violated the Bank Holding Company Act of 1956, Hawkeye and Dunlap and Weil executed a rescission agreement and a new purchase agreement (the 1971 purchase agreement). The rescission agreement provided, inter alia, that the 1969 purchase agreement was rescinded effective July 1, 1971, and that Dunlap and Weil would return the $4,150,000 purchase price by set-off against the 5¾-percent convertible secured notes due from Hawkeye. In paragraph 3 of this agreement, Dunlap and Weil agreed to pay Hawkeye an amount (later computed as $681,507) representing Jasper's earnings from July 1, 1969, through June 30, 1971. However, if Hawkeye acquired the Jasper stock before July 1, 1974, with the prior approval of the F.R.B., and if Jasper paid no dividends in the interim, the obligation of Dunlap and Weil under paragraph 3 was "void and of no effect."

The dispute between the parties in this case centers on the effect of the rescission agreement. Petitioners contend that pursuant to the 1969 purchase agreement, Hawkeye was the beneficial owner of Jasper and hence had a vested equity interest in Jasper's interim earnings of $681,507 which interest continued notwithstanding the rescission agreement and the 1971 purchase agreement. Accordingly, petitioners contend that although the $681,507 was received indirectly by Hawkeye when the F.R.B. approval was granted and Hawkeye acquired the Jasper stock, it was a nontaxable return of equity to Hawkeye. In the alternative, petitioners contend that if the rescission agreement rescinded the 1969 purchase agreement and nullified the equity interest in Jasper held by Hawkeye thereunder, then any obligation of Dunlap and Weil to pay interest under the rescission agreement was conditioned on their failure to transfer the Jasper stock without dividends previously having been paid thereon. At the closing in 1972, no dividends had been distributed by Jasper; therefore, petitioners argue, the contingent obligation of Dunlap and Weil to make payment under the rescission agreement did not arise. Petitioners conclude that since no interest was due or paid, Hawkeye did not receive interest income in either 1971 or 1972.

On the other hand, respondent argues that the rescission

agreement nullified any equitable interest which Hawkeye may have had in Jasper's earnings and profits and that under paragraph 3 of that agreement, Dunlap and Weil became unconditionally obligated to pay $681,507 interest to Hawkeye for the prior use of the $4,150,000. Respondent contends that Hawkeye received interest income in 1972 when Dunlap's and Weil's obligation was discharged. Alternatively, respondent contends that Hawkeye received the interest income in 1971 when Dunlap's and Weil's obligation to pay Hawkeye the $681,507 became fixed under the rescission agreement.

We do not find either party's analysis to be convincing, although we agree with petitioner Hawkeye that Jasper's earnings did not constitute interest income to Hawkeye. Under the parties' agreements, the $681,507 of earnings came into the picture only if the F.R.B. failed to approve the purchase. Had this happened, it would have been necessary to undo the deal which had been agreed upon subject to the condition of F.R.B. approval. Since Hawkeye had fully performed its part of the deal (by payment to Dunlap and Weil of the $4,150,000 price), it had become the beneficial owner of the Jasper stock and would have become the record owner as well had the F.R.B. approved. When the F.R.B. disapproved the deal, it was nominally "rescinded" but the "rescission" agreement was only entered into simultaneously with a new sales agreement at the same basic price, plus added compensation to Dunlap and Weil for the delay in payment. The "rescission" must be read in the light of that concurrent agreement. Payment to Hawkeye of the $681,507 of earnings remained, as before, a provision which would be triggered only in the event of frustration of the primary objective of the arrangement, which was to give the Jasper stock to Hawkeye as nearly as possible at its cost to Dunlap and Weil. Since the basic deal ultimately went through, Hawkeye was able to purchase the stock at the sellers' cost plus the agreed added compensation for the delay after June 30, 1971. Therefore, the clause requiring Dunlap and Weil to pay $681,507 to Hawkeye, in the event of failure of the condition precedent of F.R.B. approval, was never in fact activated. Hawkeye did not receive such amount directly or indirectly. It bought the stock for $4,072,190 (plus certain added amounts the tax characterization of which constitutes our next issues). With the stock, it of course received, automatically, the indirect ownership of the

interim undistributed earnings of Jasper which had been taxed to and belonged to Jasper. In short, we view the arrangement as one in which both parties at all times intended a sale of stock at $4,150,000 (reduced to $4,072,190 by F.R.B. insistence) if and when the F.R.B. approved. While it may well be that Jasper's interim earnings made the ultimate sale at that price a better bargain for Hawkeye, we fail to see why Hawkeye should be charged with $681,507 of interest income merely because it would have received that amount as compensation for the interim use by Dunlap and Weil of its $4,150,000 had the sale not been confirmed.

While we are thus unable to sustain respondent's position on this issue, we must add that we also cannot agree with Hawkeye's analysis. Hawkeye's basic position is that the $681,507 was in fact received by it when the F.R.B. approved the purchase but that it was received as a nontaxable return of equity to Hawkeye. We do not see Hawkeye as having received these earnings at all until and unless Jasper paid them to Hawkeye as a dividend. We are in closer agreement with petitioners' alternative position—that the $681,507 obligation was only a contingent agreement, based on a contingency which never occurred, and never therefore performed. Unlike petitioners, however, we find it possible to reach that point without deciding that Hawkeye's inchoate rights to the Jasper stock were in fact abrogated completely by the rescission agreement. Viewed in practical terms, it seems to us the basic 1969 agreement survived the "rescission" and the concurrent 1971 purchase agreement, being modified only to the extent required by the F.R.B. Whether or not either party had a theoretical legal "out" when the F.R.B. rejected the original deal, neither, in fact, sought to escape the deal, but rather in effect simply renegotiated it to meet the F.R.B.'s requirements.

Since we have held that Hawkeye did not have interest income, because the $681,507 was never paid, it follows that Dunlap is not entitled to a deduction for "payment" of his 83.6-percent share thereof.

*B. $177,271 Preclosing "Interest" on 9½-Percent Notes*

The next issue is the tax consequences to Hawkeye and Dunlap of the $177,271 paid by Hawkeye to Dunlap and Weil as

"interest" for the period July 1, 1971, through June 30, 1972, on the 9½-percent notes in the principal amount of $1,866,006.

Respondent contends that Hawkeye may not deduct the $177,271 because, at least until the condition precedent to Hawkeye's obligation on the notes (F.R.B. approval) was fulfilled on June 12, 1971, there was no "debt" on which interest could accrue. On the other hand, respondent denies to Dunlap the right to treat the $148,199 he received as part of his sales price for the Jasper stock as long-term capital gain. In his deficiency notice, respondent determined that this amount represented "interest income" to Dunlap, taxed it accordingly in 1972, and made a corresponding reduction in Dunlap's capital gain. In his brief, however, he appeared to abandon the position that it was "interest," saying that "it is immaterial that the $177,271 amount designated as 'interest' does. not, in fact, constitute interest as defined under the interest expense deduction provisions of I.R.C. sec. 163." Instead, he contends that to Dunlap it represents "gross income" of an unspecified nature under section 61 and not part of the purchase price. Thus, respondent would tax the amount in question to Dunlap even while denying a deduction to Hawkeye.

Petitioners take the primary position that the $177,271 was part of Hawkeye's purchase price for the Jasper stock. Petitioners therefore contend that Dunlap properly treated his $148,199 share thereof as long-term capital gain on the sale of the Jasper stock, i.e., part of the purchase price, rather than interest income. Consistent with this position, petitioners do not argue for an interest deduction to Hawkeye on the payment, unless we hold that the amount in question was interest income to Dunlap, in which case they adopt the alternative position that Hawkeye should have a deduction for the amount.

We hold that the $177,271 represented deductible interest paid by Hawkeye and that the $148,199 constituted interest income to Dunlap rather than part of the principal sales price of his Jasper stock.

Analysis of this issue requires us first to determine whether the amounts in question were *intended* by the parties to constitute interest. Secondly, if so, we must decide whether the law will give effect to such intention where the interest relates to periods prior to the existence of an unconditional obligation.

We find that both questions must be answered in the affirmative.

As to the question of the parties' intent, while the July 1, 1971, agreement is not entirely unambiguous, we find it reasonably clear that preclosing interest was not intended to constitute part of the purchase price.

Paragraph 1 of the agreement calls for sale of the stock and related options "for a total price determined pursuant to paragraph 2 of this Agreement." Paragraph 2 recites "Payment shall be made by Hawkeye to Sellers as follows:"

There follow three lettered subparagraphs. Subparagraph a calls for delivery to Sellers at the closing of "promissory notes in the principal amount of $1,866,006, payable in three installments of $622,002, each, on July 1 of each of the years 1972 through 1974, together with interest on the outstanding principal balance at 9½ percent per annum from and after July 1, 1971, payable on the date of each installment."

Subparagraph b calls for payment in cash of $2,283,994.

Subparagraph c states that "Hawkeye shall reimburse Sellers for their interest, expense and costs incurred in connection with carrying their interest in the Bank Shares purchased under the Jasper Purchase Contract from July 1, 1971, to the time of closing. It is the intention of the parties that this subparagraph c be construed so that Sellers neither incur a loss nor receive a profit from July 1, 1971, to the time of closing."

As we read subparagraph a, the preclosing interest on the 9½-percent notes was not intended to constitute part of the purchase price. First, the operative words describing how "payment shall be made" are "Hawkeye * * * agrees to deliver to Sellers at the closing promissory notes in the principal amount of $1,866,006." The remainder of subparagraph a apparently represents a description of the notes to be delivered, including the retroactive date of July 1, 1971, on which interest begins to accrue, as part of that description, rather than designating it as part of the purchase price. Secondly, petitioners' argument that interest from July 1, 1971, was part of the purchase price would prove too much, for the identical language describing preclosing interest also describes postclosing interest. Even petitioners do not contend that postclosing interest on the 9½-percent notes was part of the purchase price. Third, to the extent that there is any factual ambiguity as to the intent, the ambiguity is of

petitioners' own making as draftsmen of the agreement. Respondent has determined that the preclosing accruals in question do not constitute part of the purchase price, and petitioners, on whom must rest the burden of proof, have failed to convince us of the contrary.

Having determined that the preclosing interest was intended to be characterized as interest and not part of the purchase price, we must next consider whether such a characterization is to be given effect for tax purposes. Here, respondent contends that because the debt was only conditional until F.R.B. approval was granted, Hawkeye may not deduct the $177,271 as interest.[11] Respondent relies primarily on our decision in *Williams v. Commissioner*, 47 T.C. 689 (1967), affd. 409 F.2d 1361 (6th Cir. 1968).

As respondent correctly points out, section 163(a) provides that to be deductible, interest must be paid on an "indebtedness." Clearly, however, at the time of closing, an indebtedness existed in the amount of $1,866,006. The issue posed is whether the fact that the indebtedness was materially conditional during the period of "interest accrual" precludes the deduction of "interest" paid with respect to such period after the debt became unconditional.

In *Williams v. Commissioner, supra*, we held that a taxpayer who paid amounts denominated "interest" on unpaid premiums and a policy loan, on reinstating his Veterans' Administration life insurance, could not deduct such payments. We held that the amounts in question were simply the cost of reinstating the policy and that there was no "indebtedness" on which interest could be paid.

Far closer to the facts before us is our more recent opinion, *Monon Railroad v. Commissioner*, 55 T.C. 345 (1970). The petitioner in this case was a railroad corporation. On March 31, 1958, petitioner issued to its class A stockholders, in exchange for their stock, shares of class B stock plus 6-percent income debentures bearing preissue "interest" from January 1, 1957. Respondent disallowed petitioner's deduction of the preissue interest on the dual grounds that the debentures were really

---

[11]It could be argued that even consistent with respondent's position Hawkeye should be entitled to deduct such portion thereof as accrued between June 12, 1971, and June 30, 1971, but petitioners do not so contend, and in the light of our holding, the point is irrelevant.

"equity" and that even if they were debt, there was no debt before March 31, 1958, so that interest for the prior 15 months would be nondeductible.

We held that the debentures were debt and allowed the preissue interest deduction. In so doing, we relied heavily on *Commissioner v. Philadelphia Transportation Co.*, 338 U.S. 883 (1949), affg. per curiam 174 F.2d 255 (3d Cir. 1949), affg. 9 T.C. 1018 (1947). We construed the Supreme Court's per curiam affirmance of the opinion of the Court of Appeals for the Third Circuit in that case as inferentially overruling the contrary holding of *Commissioner v. Drovers Journal Pub. Co.*, 135 F.2d 276 (7th Cir. 1943), reversing a Memorandum Opinion of this Court.

We see no logical distinction between our case and *Monon Railroad*. In fact, justifying treatment of preissue "interest" as interest in our case is easier, for in *Monon Railroad*, preissue interest relating to periods before even a *conditional* obligation existed was held deductible, whereas in our case, the interest accrual date of July 1, 1971, coincided with the date of the 1971 purchase agreement, creating at least a conditional debt. We hold, therefore, that the preissue interest of $177,271 was deductible by Hawkeye. It follows from our characterization that the $148,199 received by Dunlap was interest income to him.

## C. *$149,864 "Reimbursement" of Sellers' Expenses.*

The next issue is the proper tax characterization of the $149,864 paid by Hawkeye to Dunlap and Weil at the closing on July 12, 1972, pursuant to the provisions of paragraph 2 c of the 1971 purchase agreement. The contentions of the parties as to this payment are similar in effect to their contentions as to the $177,271 payment just discussed. Respondent contends that the $149,864 is nondeductible to Hawkeye because it is part of Hawkeye's purchase price of the Jasper stock. On the other hand, respondent says Dunlap must include as ordinary income his 83.6-percent share thereof ($125,286) since it was "not payment made toward the purchase price." Petitioners argue, with at least internal consistency, that the payment was part of the price of the Jasper stock, to be treated as captial gain to Dunlap, and not deductible to Hawkeye unless we determine that it was ordinary income to Dunlap and Weil.

On this issue, we agree with petitioners. While the amount in

question was clearly intended to reimburse Dunlap and Weil for expenses they incurred while awaiting the closing, a fair construction of the contract requires the conclusion that this was intended as merely part of the measure of the purchase price. As part of such price, it was capital gain to Dunlap and nondeductible to Hawkeye. The parties may arrive at a purchase price in any manner they please, and proof that part of the price was designed to reimburse the seller for his interim expenses does not require us to recharacterize it as other than purchase price. *Cooledge v. Commissioner*, 40 B.T.A. 1325 (1939); cf. *Magruder v. Supplee*, 316 U.S. 394 (1942); cf. *Brown v. Commissioner*, 37 T.C. 461, 487–489 (1961), affd. on other issues 325 F.2d 313 (9th Cir. 1963), affd. 380 U.S. 563 (1965).

*Expenses Incurred To Acquire Controlling Interests in Other Corporations*

This issue arises from respondent's disallowance of $29,671, $348,622, and $131,114 of Hawkeye's claimed ordinary and necessary business expense deductions for 1971, 1972, and 1973, respectively. The disallowance is based upon respondent's determination that these costs must be capitalized as costs of acquiring controlling interests in other corporations.

The parties do not controvert the well-established rule of law that an expenditure incurred in connection with the acquisition of a capital asset is a capital investment and not deductible from income as an ordinary and necessary expense of carrying on a trade or business. *Woodward v. Commissioner*, 397 U.S. 572 (1970); *Acer Realty Co. v. Commissioner*, 132 F.2d 512 (8th Cir. 1942), affg. a Memorandum Opinion of this Court. Specifically, when one company acquires a separate and distinct company, the costs of taking it over, including the salaries of employees who spend some of their time working on the acquisition, are capital expenditures. *Briarcliff Candy Corp. v. Commissioner*, 475 F.2d 775, 781 (2d Cir. 1973); *Firemen's Insurance Co. v. Commissioner*, 30 B.T.A. 1004, 1015 (1934).

Petitioners contend that Hawkeye capitalized all the costs directly identified with the stock acquisitions during the years in issue. Petitioners further contend that respondent's allocation improperly capitalizes overhead costs which are not directly identified with the stock acquisitions. On the other hand, respondent contends that business deductions claimed by Hawk-

eye for costs of compensation, rents, interest, contributions, amortization, depreciation, advertising, pension and employee benefits, and other expenses related to the acquisition of stock interests should have been capitalized.

Petitioners analogize the facts in this case to those in *Fort Howard Paper Co. v. Commissioner*, 49 T.C. 275 (1967). *Fort Howard Paper Co.* involved the correct tax accounting treatment of overhead expenses in determining the cost of self-constructed assets having useful lives of more than one year. We found that the building activities of the taxpayer in that case were incidental to its paper manufacturing business. The taxpayer's regular employees were used to construct capital assets only during slack periods. It did not appear that there was any increase in overhead costs, including fringe benefits and drafting department costs, which could be directly associated with the self-constructed assets. We held that the taxpayer's long-used method of accounting, whereby it capitalized only the direct costs of labor and materials connected with self-constructed items, was acceptable. Compare *Fort Howard Paper Co. v. Commissioner, supra,* with *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962 (1976), on appeal (6th Cir., June 2, 1978), and *Perlmutter v. Commissioner*, 44 T.C. 382 (1965), affd. 373 F.2d 45 (10th Cir. 1967).

Although the case in issue does not involve the construction of assets, we believe the principles outlined in *Fort Howard Paper Co. v. Commissioner, supra,* are applicable here. Hawkeye's activities in acquiring banks were incidental to its business of holding and managing banks. Accordingly, we agree with petitioners that Hawkeye is required to capitalize only those costs directly associated with the stock acquisitions.

We must next determine whether Hawkeye properly capitalized all the expenditures directly related to the cost of the stock acquired during the years in issue. During the years in issue, Hawkeye purchased minority shareholdings in a number of its controlled banks. Hawkeye had standing offers to buy all the minority stock of these banks; no new negotiations or contracts were required to complete these transactions. The only effort involved in acquiring these minority holdings was the writing of a check or the honoring of a sight draft. Specifically, Hawkeye issued 21 checks during 1971 and 31 checks (or honored sight drafts) during 1973 for minority acquisitions. Because these

efforts were de minimis and incidental to the regular tasks performed by Hawkeye's employees, Hawkeye's failure to allocate thereto and capitalize a portion of its expenses was proper.

In 1971, Hawkeye contracted to purchase the Citizens National Bank of Boone (Citizens) and the First Federal State Bank (First Federal). During that year, Hawkeye applied to the F.R.B. for approval of these acquisitions. Hawkeye also executed the rescission agreement, the 1971 purchase agreement, and related documents with respect to the Jasper County Savings Bank acquisition.

Hawkeye's comptroller capitalized legal fees, accounting fees, filing fees, travel expenses, and supplies and printing expenses. The comptroller further capitalized 2 weeks of Dunlap's salary and 3 months' salary of two other Hawkeye employees for their efforts with respect to the Citizens and First Federal contracts and the Federal Reserve Board applications. We accept the comptroller's testimony that the work involved in these negotiated acquisitions was relatively simple and that the proper amounts of compensation, accounting fees, legal fees, and other related costs were capitalized. However, no amount of compensation was capitalized with respect to the Jasper acquisition. Because this was a renegotiation, we find that only a portion of the average amount required to compensate Dunlap and the other employees for their efforts with respect to the Citizens and First Federal acquisitions should be capitalized as costs incurred in acquiring Jasper. Accordingly, we hold that $3,000 claimed by Hawkeye as expense for compensation in 1971 must be capitalized.

Hawkeye did not contract to purchase any new banks in 1972. It did, however, consummate contracts for six new banks during that year. Hawkeye negotiated the contracts and submitted the F.R.B. applications for approval of these acquisitions prior to 1972. In 1973, the comptroller capitalized legal and accounting expenses associated with the consummation of the six purchases.

During 1972, Dunlap traveled to Chicago on behalf of Hawkeye to discuss pending acquisitions with the Chicago office of the F.R.B. Based on our best judgment, we find that $500 of travel expense should have been capitalized. Accordingly, we hold that $500 of the business expense deduction claimed in 1972 is disallowed. We accept the comptroller's testimony that there

were no other direct expenses which Hawkeye should have capitalized as costs of acquiring the controlling interests.[12]

In 1973, Hawkeye contracted for the purchase of the Farmers Savings Bank, the negotiations taking only 1 or 2 days. During this same year, Hawkeye made application to the F.R.B. for approval of this acquisition and consummated the purchase. Hawkeye capitalized $2,896 in compensation paid for the preparation of the F.R.B. application and $1,912 in legal fees paid for assistance in the F.R.B. negotiations.

In light of the facts, we believe that Hawkeye neglected to capitalize Dunlap's salary connected with the negotiations and the printing costs related to the F.R.B. application. We find that $600 of Dunlap's $75,000 salary was paid for negotiating the Farmers Savings Bank acquisition. Based on the amount of printing costs incurred in 1971 when Hawkeye submitted F.R.B. applications for two banks and a Securities and Exchange Commission registration statement, we find that the printing costs associated with the acquisition of the Farmers Savings Bank were $3,000. Furthermore, Dunlap traveled to Chicago during 1973 to discuss pending acquisitions with F.R.B. people. We find that $500 in claimed travel expense was expended for such trips which Hawkeye should have capitalized. Accordingly, we hold that $4,100 ($600 + $3,000 + $500) in business expense deductions claimed in 1973 is disallowed.

Respondent contends that Hawkeye should have also capitalized a percentage of its costs related to rent, interest, contributions, amortization, depreciation, advertising, pension and employee benefits, and miscellaneous expenses. In light of the facts presented, we do not believe that any of these expenditures were directly identified with the costs of acquiring the controlling interests in other banks or that the cost of these items was increased by Hawkeye's acquisition efforts. Accordingly, we hold that Hawkeye properly treated the cost of these items during the years in issue.

---

[12]On brief, and for the first time, respondent alleged that Hawkeye should have capitalized salary expense for the time Hawkeye's officers spent on the preparation of the prospectus and the Securities and Exchange Commission registration statement issued in 1972. Because this issue was not timely raised, we do not consider respondent's allegations. *Estate of Horvath v. Commissioner*, 59 T.C. 551 (1973).

## Lapse of Option

The next issue is whether Hawkeye's option to purchase the Stephens Building expired or lapsed during 1973 thereby entitling Hawkeye to a $35,000 loss deduction under section 1234. In 1973, section 1234(a) and (b)[13] provided as follows:

(a) TREATMENT OF GAIN OR LOSS.—Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

(b) SPECIAL RULE FOR LOSS ATTRIBUTABLE TO FAILURE TO EXERCISE OPTION.— For purposes of subsection (a), if loss is attributable to failure to exercise a privilege or option, the privilege or option shall be deemed to have been sold or exchanged on the day it expired.

The parties agree that Hawkeye is not entitled to a loss deduction until the option granted lapses because it is not until this time that the characterization of the payments as losses or capital expenditures can be determined. Respondent asserts, however, that, in substance, the option agreement provided for one 10-year option to purchase the Stephens Building for $2 million with a right to apply all or a portion of the $350,000 option cost toward the purchase price on a deescalating basis in the event the option were exercised. Respondent further contends that the 10-year option cannot lapse until July 11, 1982, and it is at that time, and not before, that the full cost of the option would be deductible under the provisions of section 1234. It is petitioners' position that Hawkeye contracted for a series of 10 consecutive 1-year options to acquire the Stephens Building for $2 million. Petitioners contend that one $35,000 option lapsed during 1973 entitling Hawkeye to a loss deduction. We agree with petitioners.

While it is true that substance rather than form is controlling in the determination of the tax effect of an option agreement (*Martin v. Commissioner*, 44 T.C. 731, 740 (1965), affd. on this issue 379 F.2d 282 (6th Cir. 1967)), there is nothing in the record which would lead us to believe that the option contract granted a 10-year contract rather than 10 separate 1-year contracts. The

---

[13]This section was amended by sec. 2136(a), Pub. L. 94–455, 90 Stat. 1929; effective for options granted after Sept. 1, 1976.

contract itself is clear and unambiguous stating that Stephens Industries, Inc., the owner of the Stephens Building, granted Hawkeye 10 separate 1-year options valued at $35,000 per option. The contract specifically designated 10 options with 10 different consecutive effective dates and 10 corresponding 1-year expiration dates.

Nonetheless, it is respondent's position that the contract provision which states that the option price money could be refunded, but not credited against the purchase price, is illusory and indicative of one 10-year option, since it makes no difference whether the option money is refunded or credited against the purchase price. Paragraph 2 of the agreement provides that if an option is exercised, amounts paid to Stephens Industries, Inc., for unexercised and unexpired options will be refunded to Hawkeye as follows:

| Option number | Effective date | Expiration date | Base price | Amount of option refund |
|---|---|---|---|---|
| 1 | July 12, 1972 | July 11, 1973 | $2,000,000 | $315,000 |
| 2 | July 12, 1973 | July 11, 1974 | 2,000,000 | 280,000 |
| 3 | July 12, 1974 | July 11, 1975 | 2,000,000 | 245,000 |
| 4 | July 12, 1975 | July 11, 1976 | 2,000,000 | 210,000 |
| 5 | July 12, 1976 | July 11, 1977 | 2,000,000 | 175,000 |
| 6 | July 12, 1977 | July 11, 1978 | 2,000,000 | 140,000 |
| 7 | July 12, 1978 | July 11, 1979 | 2,000,000 | 105,000 |
| 8 | July 12, 1979 | July 11, 1980 | 2,000,000 | 70,000 |
| 9 | July 12, 1980 | July 11, 1981 | 2,000,000 | 35,000 |
| 10 | July 12, 1981 | July 11, 1982 | 2,000,000 | 0 |

While it is true that the provision for refund has the same monetary effect to Hawkeye as a credit would have, the refund provision applies only to unexercised and unexpired options. Here, the option in issue, option number 1, expired on July 11, 1973. The cost of that option could not thereafter be refunded or credited in any way against the purchase price if one of the remaining options were later exercised. Thus, we do not have the classic situation where the character of the $35,000 payment cannot be determined in 1973, which necessitates postponement of recognition of gain or loss. See *Virginia Iron Coal & Coke Co. v. Commissioner*, 37 B.T.A. 195 (1938), affd. 99 F.2d 919 (4th Cir.

1938), cert. denied 307 U.S. 630 (1939); *Koch v. Commissioner*, 67 T.C. 71 (1976).[14] Accordingly, we hold that Hawkeye is entitled to deduct the loss on the $35,000 option which lapsed in 1973.

### *Depreciation Expense Claimed by Dunlap*

The issue presented is whether Dunlap had a sufficient investment interest in the Safeway Stores, Inc., warehouse distribution facility in El Paso, Tex., to entitle him to deduct depreciation expense. Respondent raised this issue in an amendment to his answer. Generally, it is the petitioner who must bear the burden of proof in matters before this Court. However, it is respondent who bears the burden of proof with respect to positions raised in his amended answer. Rule 142(a), Tax Court Rules of Practice and Procedure.

In March 1973, Safeway Stores, Inc. (Safeway), completed construction of a regional office, distribution center, and related facilities in El Paso (Warehouse Distribution Center). Safeway sold the property to El Paso Properties Corp. (El Paso Properties) for $8,800,000. El Paso Properties was a single-purpose finance corporation 100-percent owned by Janus Leasing & Development Corp. (Janus Leasing). El Paso Properties was created to accommodate the Texas insurance and usury law requirements accompanying the sale-leaseback transaction.

Simultaneously with the purchase of the Warehouse Distribution Center, El Paso Properties leased the property back to Safeway. El Paso Properties financed $8,412,947 of the Warehouse Distribution Center purchase price by placing its secured notes with institutional investors. These notes were secured by an indenture of mortgage and deed of trust and by an assignment of the Safeway lease and the rentals therefrom to trustees (trustees) for the institutional investors. The remainder of the purchase price was financed by eight individual investors, one of whom was Dunlap. Dunlap made a $116,100 cash payment for a 30-percent interest in the facility.

Upon completion of the above, El Paso Properties transferred all of its interest in the Warehouse Distribution Center, subject to the indenture of mortgage, the lease and the assignment of

---

[14]See also *Hicks v. Commissioner*, a Memorandum Opinion of this Court, 37 T.C.M. 1540, 47 P–H Memo T.C. par. 78,373 (1978).

the lease, to the individual investors as tenants-in-common. Dunlap and the other individual investors assumed all of El Paso Properties' obligations under the lease and the indenture of mortgage except the obligation to pay principal, premium, and interest on the secured notes and the obligations imposed upon Safeway under the lease. The individual investors also contracted with Janus Leasing for management services with respect to their investment for $2,400 annually.

The lease was a "triple net" lease. The $761,507 annual rent payments were calculated to provide the individual investors with just enough money to meet the periodic principal and interest payments and yearly management fees for the original 25-year term of the lease, i.e., the same 25-year term that the secured notes were outstanding. At the end of this 25-year period, Safeway has the option of extending the lease for six additional periods of 5 years each at an annual rent of $264,000.

It is respondent's position that the sale-leaseback transaction was a "sham" transaction entered into by Dunlap for the purpose of creating artificial tax losses. Alternatively, it is respondent's position that the sale-leaseback transaction was not entered into for profit. In support of his position, respondent argues that in substance, the sale-leaseback transaction was nothing more than a two-party financing arrangement between Safeway and the institutional investors. On the other hand, petitioners contend that the sale-leaseback was a multiparty transaction which resulted in Dunlap's receiving a 30-percent depreciable interest in the Warehouse Distribution Center.

More specifically, respondent argues that this case is factually akin to and should be governed by *Helvering v. Lazarus & Co.*, 308 U.S. 252 (1939), whereas petitioners argue that the case is more analogous to *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). We agree with petitioners.

In *Helvering v. Lazarus & Co., supra*, the taxpayer was a department store. The legal title of its two buildings and a 99-year lease of a third building had been sold by the taxpayer to a bank, as trustee, for land-trust certificate holders. The trustee simultaneously leased the properties back to the taxpayer for 99 years, with options to renew the lease. Respondent disallowed the taxpayer's depreciation deductions on the buildings, taking the position that the statutory right to depreciation followed legal title. The Board of Tax Appeals concluded that the

transaction between the taxpayer and the bank was, in substance, a mortgage loan and held that the taxpayer was entitled to the depreciation deduction. The Sixth Circuit affirmed as did the Supreme Court. In noting its agreement with the Board of Tax Appeal's conclusion that the transaction was actually a loan secured by property, the Supreme Court regarded the "depreciation fund" required by the lease as an amortization fund designed to pay off the loan principal in the stated period.

More recently, in *Frank Lyon Co. v. United States, supra,* the Supreme Court upheld the form of a sale-leaseback transaction using a factual analysis. Initially, Worthen Bank & Trust Co. (Worthen) planned to construct a bank and office building. Because of State usury laws and Federal Reserve System regulations, Worthen was prevented from erecting the building itself and financing the construction through the sale of debentures and a conventional mortgage loan. As an alternative, Worthen proposed a sale-leaseback transaction. The bank regulatory authorities approved the plan as long as the title to the property was held by an independent third party and Worthen retained an option to purchase the property after the 15th year of the lease.

With these requirements in mind, and after obtaining a commitment for permanent financing, Worthen entered into negotiations with several interested entities. As a result, the Frank Lyon Co. (Lyon) was selected to be the buyer-lessor of the bank building. Thereafter, Worthen and Lyon executed interlocking agreements wherein Worthen leased the underlying land to Lyon for 76 years, sold the building to Lyon in stages as it was constructed, and leased the building back from Lyon for a 25-year primary term and eight 5-year option terms. The sale and leaseback were effected simultaneously.

Lyon purchased the building for a total price of $7,640,000, which was financed in part by a loan from New York Life for $7,140,000. The remaining $500,000 was paid by Lyon to Worthen in cash from its own funds. Lyon assumed personal responsibility for the repayment. The loan was further secured by an assignment of the building lease and a mortgage on the building. Worthen had options to repurchase the building at periodic intervals for the amount of the outstanding mortgage plus Lyon's original $500,000 investment, with 6 percent compounded thereon.

The lease was a net lease with Lyon's only current financial obligation being the quarterly mortgage payments. Rent payments for the primary term were calculated to exactly equal the mortgage payments. Thereafter, the rent was reduced by approximately 50 percent to $300,000 per annum for each elected extended term.

Respondent disallowed Lyon's claimed deductions for depreciation on the building and interest on the mortgage loan, taking the position that Lyon was not the owner for tax purposes. Respondent asserted that Lyon merely loaned Worthen $500,000 and acted as conduit for the mortgage payments from Worthen to New York Life.

The District Court held that Lyon was entitled to the depreciation and mortgage interest deductions. The District Court based its finding that the substance comported with the form on the fact that the rent payments were reasonable, the option prices represented the fair market value of the properties, and the unlikelihood that Worthen would exercise the repurchase option. It refused to draw any negative inference from the fact that rentals combined with options were sufficient to amortize the loan and pay Lyon a fixed 6-percent return on its equity or that the lease was a net lease.

The Court of Appeals reversed. Analogizing property rights to a bundle of sticks, the Court concluded that Lyon did not have sufficient sticks to allow it to be treated as the owner.

The Supreme Court reversed the Court of Appeals, sustaining the form of the transaction, and held that Lyon was indeed the owner of the property for tax purposes. The Court refused to accept the Government's reliance on *Lazarus* as controlling. The Court distinguished *Lazarus* as follows:

> The *Lazarus* case, we feel, is to be distinguished from the present one and is not controlling here. Its transaction was one involving only two (and not multiple) parties, the taxpayer-department store and the trustee-bank. The Court looked closely at the substance of the agreement between those two parties and rightly concluded that depreciation was deductible by the taxpayer despite the nomenclature of the instrument of conveyance and the leaseback. * * *
>
> The present case, in contrast, involves three parties, Worthen, Lyon, and the finance agency. The usual simple two-party arrangement was legally unavailable to Worthen. Independent investors were interested in participating in the alternative available to Worthen, and Lyon itself (also independent from Worthen) won the privilege. Despite Frank Lyon's presence on Worthen's board of directors, the transaction, as it ultimately developed, was not a

familial one arranged by Worthen, but one compelled by the realities of the restrictions imposed upon the bank. Had Lyon not appeared, another interested investor would have been selected. The ultimate solution would have been essentially the same. Thus, the presence of the third party, in our view, significantly distinguishes this case from *Lazarus* and removes the latter as controlling authority. [435 U.S. at 575–576.]

Respondent argues that, although it appears that the sale-leaseback transaction in issue is a three-party transaction between Safeway, the institutional investors, and El Paso Properties as nominee for the individual investors, the transaction, in substance, was between Safeway and the institutional investors.

First, respondent notes that the three-party arrangement under the Supreme Court's decision in *Frank Lyon Co. v. United States, supra,* was meaningful only because the three parties had interlocking obligations. Respondent contends that personal liability is essential to any bona fide three-party transaction. The fact that the buyer-lessor in *Frank Lyon* was personally liable on the mortgage was a significant factor supporting substance of the sale-leaseback transaction. That factor is lacking here; the secured notes were nonrecourse as to Dunlap and the other individual investors. However, as we recently stated in *Hilton v. Commissioner,* 74 T.C. 305, 363 (1980), "we regard personal liability on the mortgage as atypical in modern real estate transactions and, consequently, we consider the absence of personal liability as a neutral factor in the case before us." Accordingly, we refuse to draw any negative conclusions about the nonrecourse nature of notes issued in this case. Furthermore, we note that the individual investors and the institutional investors joined together to purchase the Warehouse Distribution Center from Safeway. Specifically, Dunlap paid $116,100 in personal funds to Safeway as part of the purchase price.[15]

Second, respondent argues that the two-party arrangement is evidenced by the fact that the institutional investors would not carry the secured notes in the event that Safeway terminated the lease agreement by purchase of the Warehouse Distribution

---

[15]In *Frank Lyon Co. v. United States,* 435 U.S. 561, 576 (1978), the Supreme Court noted that *Helvering v. F. R. Lazarus & Co.,* 308 U.S. 252 (1939), would apply if Worthen had been able to simply make a mortgage agreement with New York Life and had received a $500,000 loan from Lyon. Here, as in *Frank Lyon,* no evidence was presented that the cash payment represented a loan from Dunlap to Safeway.

Center. Respondent's argument, however, fails in light of the facts. If the individual investors accepted Safeway's offer to sell under the various provisions of the lease, the purchase price was set at an amount which approximated the remaining balance on the mortgage. The sales proceeds would be applied against the outstanding notes and the institutional investors would remove the lien on the property. All this implies is that the individual investors would have sold their property and paid off the mortgage securing it.

Third, respondent argues that the two-party nature of the transaction is evidenced by the requirement that Safeway must furnish the institutional investors with financial statements. We also note that El Paso Properties must furnish the institutional investors with its financial statements and balance sheets. Respondent, on whom the burden of proof lies, presented no evidence as to the use or dependence placed upon these statements by the institutional investors. Accordingly, we refuse to draw any conclusion about the significance of this requirement.

Fourth, respondent points out that the rent paid by Safeway under the initial lease term approximates the principal and interest payments due under the secured notes, plus the management fee payable to Janus Leasing. We have recently stated, however, that rent during an initial lease term geared to the cost of interest and mortgage amortization, is not, in and of itself, much more than a neutral commercial reality. *Hilton v. Commissioner, supra.* We fail to draw any negative inference from this fact here. Cf. *Frank Lyon Co. v. United States, supra.*

Fifth, respondent argues that Dunlap entered into this transaction solely for tax-avoidance reasons. The facts, however, do not support respondent's contention. Although he was fully aware of the tax consequences of his investment, Dunlap also testified that he was motivated to make the investment because he believed that the land on which the Warehouse Distribution Center was located would appreciate in value and because he believed that the town of El Paso had tremendous potential. The respondent, on whom rests the burden of proof, failed to establish that there was no merit in these asserted economic motivations, and we cannot therefore support a finding of absence of non-tax purpose for the investment. We therefore need not decide what the result would be if such a finding were

made. Cf. *Hilton v. Commissioner, supra.* In *Hilton,* moreover, it was proven that the "tax shelter" partners' cash all went to the shelter promoters and did not constitute a bona fide investment in the real property. Such is not the case here where the coowners' investment was capitalized in its entirety. Moreover, if Safeway did not renew its lease after the initial 25-year lease expired, the coowners would own the property outright regardless of whether the property were then very valuable or worthless. Safeway had no option to purchase the property at this point. There is no evidence in the record that Safeway would or would not exercise the renewal rights. Respondent argues that Safeway would renew the lease because of the greatly reduced rent during the renewal period. If the lease *were* renewed, the coowners' yield after payoff of the mortgage would be a high percentage of their original investment. Petitioners' expert witness, moreover, concluded that the current facility will be obsolete before the end of 25 years, leading to the conjecture that Safeway would not renew the lease. Eventually, whether Safeway exercises any of its renewal rights or not, the coowners will own the property free of the lease. If, as petitioners' expert predicts, it is by then in a densely populated area, the land will be put to another use better suited to its increased value. We cannot, therefore, find that the investment was purely tax motivated or that it presents no realistic hope of material economic (nontax) gain from the investment.

In light of the above, we conclude that respondent has not proven that Dunlap's ownership was a sham. Accordingly, Dunlap owned a depreciable interest in the Warehouse Distribution Center and is therefore entitled to a depreciation deduction.

Because we have decided that Dunlap has a depreciable interest in the Warehouse Distribution Center, we must next decide whether the useful life of the buildings is 30 years as petitioners contend or 50 years as respondent contends.

Section 1.167(a)–1(b), Income Tax Regs., defines useful life, in pertinent part, as follows:

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the

factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. * * *

At trial, both parties presented the testimony of expert witnesses.

Respondent's expert is a real estate appraiser for the Internal Revenue Service. He does not have an engineering background, nor has he prior experience in useful life determinations.

Respondent's expert addressed each of the factors set forth in the regulations and concluded that the useful life of the Warehouse Distribution Center buildings is 50 years. He arrived at his opinion by visiting the Safeway facility and examining its construction, condition, and utilization, talking with Safeway managers and supervisors, studying the growth of the town of El Paso, talking with industrial realtors, and using valuation publications and services.

Petitioners' expert holds a master's degree in civil engineering and is employed by Coopers & Lybrand, a national accounting firm. His assignments have pertained to replacement cost, engineering, valuation, depreciation, and ad valorem tax issues. In addition, he has assisted many of his firm's clients on questions relating to the useful life of leased properties.

Petitioners' expert addressed each of the factors set forth in respondent's regulation. He concluded that the useful life of the buildings was 30 years. He reached this conclusion by visiting the Warehouse Distribution Center and inspecting the construction, condition, and utilization of the buildings. He analyzed, among other items, the experience of Safeway using similar property; the general experience of the food industry as a whole; the "single-purpose use" design of the facility; the probability of design obsolesence; local conditions and trends in the El Paso area, including climate, traffic patterns, population density, and growth; and the current wear and tear on the property from its intended and actual use. Petitioners' expert studied applicable case law and other authorities, Department of the Treasury

studies, and statistics concerning buildings similar to those found at the Warehouse Distribution Center, and various published life data. Furthermore, he held discussions with operating personnel at the facility and with Safeway's engineer in charge of the Industrial Design and Construction Department. Of major significance was the expert's finding that the facilities at the Warehouse Distribution Center were already becoming obsolete because in 1975 or 1976, Safeway and others in the industry introduced a new 70-foot high warehouse design that incorporated mechanical, automated storage and retrieval of merchandise.

Respondent contends that Dunlap is in the warehouse leasing business and that petitioners' expert did not give adequate consideration to the present and future potentials of the warehouse leasing market in the El Paso area as a whole versus the food industry in particular. We accept, however, petitioners' expert's determination that the buildings in issue had a "single-purpose use" design and, therefore, it was appropriate for this expert to base his conclusions on the food warehouse leasing industry.

Having heard the testimony of both experts and examined their reports, we conclude that the useful life of the Warehouse Distribution Center buildings is 35 years.

*Decisions will be entered under Rule 155.*